DeBOLT, Appellant,

v.

EASTMAN KODAK COMPANY et al., Appellees.

[Cite as DeBolt v. Eastman Kodak Co., 146 Ohio App.3d 474, 2001-Ohio-3996.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 01AP–55.

Decided Nov. 29, 2001.

476

Law Offices of Mowery & Youell, Samuel N. Lillard and Elizabeth J. Birch, for appellant.

Vorys, Sater, Seymor & Pease, LLP, W. Breck Weigel and Thomas B. Ridgley, for appellees.

PETREE, Judge.

{¶1} Plaintiff, William E. DeBolt, appeals from a judgment of the Franklin County Court of Common Pleas granting the summary judgment motion of defendants, Eastman Kodak Company ("Kodak") and John Shatzer, on plaintiff's handicap discrimination claim.

{¶2} Plaintiff was employed by Kodak as a field engineer in Kodak's Customer Equipment Services Division from June 22, 1970, until his termination on February 27, 1997. As a field engineer, plaintiff was required to travel to Kodak customer premises to service, repair, and install various types of imaging equipment. Among the types of equipment plaintiff serviced and/or repaired were large, laser-powered microfiche machines known as KOM equipment.[1] The KOM equipment was usually housed in highly air-conditioned environments with false floors and numerous vents for increased airflow.

{¶3} Kodak provided plaintiff with the training necessary to service and/or repair Kodak's equipment, including the KOM equipment. As new products were developed and/or upgrades to the equipment occurred, Kodak provided plaintiff with appropriate training. Many of these training sessions occurred in Rochester, New York, the location of Kodak's corporate headquarters. The training sessions varied in length of time.

---

1. Kodak used the acronym "KOM" to identify "computer output microfilmers"—the "K" to signify "Kodak."

{¶4} During the time period particularly relevant to the instant case (1993–1996), plaintiff worked in Kodak's Columbus Business Information Systems ("BIS") division. The Columbus BIS team was composed of a group of field engineers who serviced and maintained Kodak equipment in central Ohio. Each field engineer was responsible for a specific territory composed of specific Kodak customer accounts. The number of field engineers in the Columbus BIS area during the relevant period of time varied from five to seven.

{¶5} Several of Kodak's customers in the central Ohio area had KOM equipment for which Kodak provided twenty-four-hour service contracts. Because of these service contracts, the field engineers who were responsible for servicing KOM equipment were required to participate in a "standby" program, which required the field engineers to be available twenty-four hours a day to answer customer service calls. As participation in the "standby" program was demanding, the field engineers rotated the responsibility for being on "standby." In 1993, only three field engineers on the Columbus BIS team—including plaintiff—were trained to service the KOM equipment. All three participated in the "standby" program.

{¶6} On September 11, 1993, plaintiff became ill with a serious viral infection and was hospitalized and unable to work for much of the remainder of 1993. Although plaintiff's condition stabilized and he was able to return to work, plaintiff's illness left him with a permanent diagnosed condition of gastroesophageal reflux, causing recurrent pulmonary problems. The condition causes him to suffer from an asthma-like condition of chronic incapacitating severe cough. Plaintiff suffers a relapse of his symptoms when exposed to cold air environments. When plaintiff eventually returned to work in December 1993, he did so without medical restrictions.

{¶7} In January 1994, plaintiff informed his then manager, Nick Givens, that he had developed "heightened sensitivity" to cold air and should avoid cold environments. In addition, plaintiff refused to attend an out-of-town training assignment, stating that he wanted to be near his medical provider. Plaintiff further informed Givens that out-of-town training could not be planned for the future. Kodak, through its health services coordinator, Joan Davis, R.N., advised plaintiff that medical verification was needed to clarify his medical status. In response, plaintiff submitted a note from his treating physician, Richard A. Brandes, M.D. The note was dated January 5, 1994, and indicated that since plaintiff's illness in October 1993, cold weather and certain chemical fumes aggravated his "lung & throat problems." No medical restrictions were imposed by Dr. Brandes.

{¶8} After receiving the January 5, 1994 note, Nurse Davis requested further clarification of plaintiff's medical condition. In a note dated April 24, 1994, Dr.

Brandes indicated that plaintiff had developed a sensitivity to cold air that would probably last for a year. Again, no medical restrictions were imposed.

{¶9} By letter dated April 29, 1994, Nurse Davis requested clarification of Dr. Brandes's April 24, 1994 note, specifically as to whether medical restrictions were recommended or required. In response, Dr. Brandes provided a letter, dated June 22, 1994, which read as follows:

{¶10} "My request for work privilidge [sic] is based upon several things. Mr. DeBolt had a debilitating cough and hemoptysis that put him in the hospital for extensive tests. A definite cause was never determined.

{¶11} "However, since he was discharged in October of 1993, Mr. DeBolt has had several episodes of a similar cough that responded to antibiotics. Antecendent [sic] to these episodes there has been an exposure to air draft, usually cold. Exposure to excess chemical fumes also is bothersome.

{¶12} "It is desired that Mr. DeBolt can move away from these physical conditions when he meets them."

{¶13} Following receipt of Dr. Brandes's June 22, 1994 letter, Nurse Davis informed Givens, by memorandum dated June 30, 1994, as follows:

{¶14} "The restriction by Dr. Brandes to avoid cold air drafts does not appear to significantly affect Bill's present position, because both the doctor and Bill have agreed simply moving away from drafts would be an acceptable accommodation. * * *

{¶15} "This restriction however, has potential for affecting future placement, especially to Comstar duties since these presumably would occur in a cold, closed environment with constant air drafts. * * *

{¶16} "* * * [W]e have a clearly defined medical problem, as verified by a lengthy history of treatment, with proactive, specialized care by both the primary doctor and the specialist, and a restriction has been clearly prescribed. * * * [T]he advised restriction is not unreasonable. * * *

{¶17} "This does not mean this case cannot be treated proactively, now that we finally have a specified restriction to work with. Dr. Brandes has been advised of Bill's job functions and clearly confirmed Bill only has this one accommodation need, which can be simply accommodated, at least in his present job. We have now diligently determined that Bill only has this one accommodation need, and we can confirm Bill's ability to perform job functions and to be expected to meet all job expectations, without regard to his medical condition. * * *"

{¶18} After further correspondence between Nurse Davis and Dr. Brandes, Givens advised plaintiff by memorandum dated August 5, 1994, that he would not

be assigned to service and/or repair equipment housed in computer rooms with "increased air flow due to false/raised floors with numerous vents." Such restrictions effectively precluded plaintiff from working in all environments wherein the KOM equipment was housed. Givens noted, however, that no other restrictions existed that would prevent plaintiff from performing the duties described in his job description. Givens further advised plaintiff that business conditions within the Columbus BIS service area at that time permitted Kodak to provide the accommodation. However, Givens specifically advised plaintiff that as "equipment populations and business conditions change it may be necessary in the future to train [him] on other product lines and/or adjust [his] working hours [to] better accommodate [his] restrictions."

{¶19} Plaintiff remained on this modified work assignment for approximately two and one-half years. During this time period, plaintiff did not service any KOM equipment. As a consequence, plaintiff did not participate in the twenty-four-hour "standby" program. Plaintiff continued, however, to service all non-KOM products in the BIS division.

{¶20} In November 1995, plaintiff was "loaned" to assist another field engineer with the servicing of Apple computer products, after Kodak secured a servicing contract for the Apple computer. In April 1996, plaintiff was offered a position as a field engineer in Kodak's New Products Division. Plaintiff rejected the offer and chose to remain in the BIS division.[2]

{¶21} On April 23 and May 10, 1996, Nurse Davis wrote to plaintiff and Dr. Brandes, respectively, seeking an update of plaintiff's current medical status, including whether the medical restrictions imposed in June 1994 were still appropriate. By way of response, Dr. Brandes indicated that plaintiff had "no specific pulmonary problem except that he has a sensitivity to drafts which sets off coughs." He further indicated that the medical restrictions currently in place were warranted based upon plaintiff's present medical condition. In a memorandum dated June 11, 1996, Nurse Davis informed plaintiff's new manager, defendant John Shatzer, and Shatzer's supervisor, district manager Joseph O'Brien, that Dr. Brandes had confirmed that plaintiff's restrictions were of an indefinite duration.

{¶22} In October 1996, Kodak underwent a company-wide restructuring and reduction in force that resulted in the layoff of two field engineers in the Columbus BIS service team. As a result of the layoff, only plaintiff and one other field engineer had the necessary training to service the KOM products for

---

**2.** Initially, servicing of the Apple product line fell within Kodak's BIS Division; however, in April or May 1996, servicing of the Apple product line was merged into the New Products Division.

the entire Columbus BIS service area. As a consequence, Shatzer and O'Brien met with plaintiff on October 22, 1996, and advised him that as a result of the layoff, Kodak needed a trained field engineer to assist in servicing the KOM products and participate in the "standby" program. According to the deposition testimony of Shatzer, plaintiff was asked to obtain an update from Dr. Brandes on his medical restrictions so that Shatzer and O'Brien could make decisions regarding plaintiff's medical accommodations and the KOM servicing situation. In contrast, plaintiff testified by deposition that Shatzer and O'Brien told plaintiff that he must have the medical restrictions lifted so that he could work on the KOM equipment again. According to plaintiff, he thereafter contacted Tom Zerante, an employee in Kodak's Human Resources Department, and asked him what would happen if Dr. Brandes did not lift the restrictions. Zerante responded that if the restrictions were not lifted, plaintiff could be placed on disability. Fearing that he would lose his job, plaintiff asked Dr. Brandes to lift the restrictions.

{¶23} By letter dated October 25, 1996, Dr. Brandes informed Kodak that the restrictions placed on plaintiff's work assignments were lifted and he could return to unrestricted activities. On October 26, 1996, plaintiff wrote Nurse Davis, explaining that Dr. Brandes had lifted the medical restrictions only because plaintiff told him that he had been informed by Kodak management that, due to company downsizing, he probably would not have a job in Columbus if the restrictions were not lifted. Upon receipt of both letters, Nurse Davis confirmed with Dr. Brandes, both verbally and in writing, that plaintiff's medical restrictions were properly lifted. In further response to plaintiff's letter, O'Brien wrote to plaintiff on November 1, 1996, stating that the reason an update of his medical status was requested was to determine possible work options for him if he could not service KOM products. After receiving O'Brien's letter, plaintiff did not have the medical restrictions reinstated.

{¶24} After plaintiff's medical restrictions were lifted, he began servicing the KOM equipment again. According to Shatzer's deposition testimony, plaintiff never indicated that he was having medical problems stemming from working in the KOM environment. However, plaintiff did inform Shatzer that he felt uncomfortable servicing the KOM equipment because it had been a long time since he had serviced that equipment. He indicated that he felt especially uncomfortable servicing the "image-generator" portion of the KOM equipment because he missed the training on that portion during his original KOM training.

{¶25} In early December 1996, Shatzer arranged for plaintiff to take the two-week "image-generator" portion of the KOM training at Kodak's training center in Rochester, New York, in late February or early March 1997. When Shatzer informed plaintiff of the scheduled training, plaintiff advised him that he also

needed training on the "data-writer" equipment. When Shatzer contacted the Rochester training center to request the additional training, he was advised that since plaintiff needed training on two types of equipment, it would be more beneficial for plaintiff to take the entire seven-week KOM equipment class. Thereafter, Shatzer scheduled plaintiff for the seven-week class.

{¶26} In late February 1997, when Shatzer became aware of the precise dates for the class, he instructed Kodak field specialist, Daniel Hein, to advise plaintiff that he had been scheduled for the seven-week program beginning March 3, 1997. According to the deposition testimony of Hein, plaintiff indicated that he was not going to attend the training because he did not want to miss his son's school activities. After being advised of plaintiff's response, Shatzer telephoned plaintiff on February 26, 1997, and told him that he was expected to attend the March 3, 1997 training. According to the affidavit and deposition testimony of Shatzer, plaintiff said he was not going to attend the training because of his son's school activities and because his wife told him he was not going. Shatzer told plaintiff that such refusal could have serious consequences. Thereafter, plaintiff stated that he would go back to Dr. Brandes and have his medical restrictions reinstated. One day later, on February 27, 1997, Shatzer terminated plaintiff from his employment with Kodak as a consequence of plaintiff's refusal to attend the training.

{¶27} According to plaintiff's deposition testimony and the allegations set forth in the complaint, plaintiff's cough and sensitivity to cold resumed after he again began working in the KOM environment. Although he told co-workers of the problems he was experiencing, he did not inform Shatzer. When Hein informed him that he had been scheduled for the seven-week training session in Rochester, plaintiff was concerned that Kodak expected him to become the primary KOM technician and that such expectation was impossible given his health problems. Accordingly, plaintiff asked Shatzer on February 26, 1997, if he could be scheduled for a shorter training session, or if he could attend the full seven-week training at a different time. In addition, plaintiff suggested that since he needed only a portion of the training, it would make more sense to send another field engineer to attend the full seven-week training session. Plaintiff also informed Shatzer that the cold air in some of the computer rooms was bothering him and that he may need to resume his medical restrictions. Shatzer stated that he would call plaintiff and let him know what he had decided. Shatzer telephoned plaintiff the next day and told him he had been terminated. On February 28, 1997, plaintiff met with Dr. Brandes in order to obtain "a recent note * * * backing up the fact that I was having problems." The note stated: "[I]n 1993 [plaintiff] developed some pulmonary problems thought to be viral. The residual

problem is sensitivity to cold and cold drafts which produce chest discomfort. He tries to avoid these situations."

{¶28} On February 26, 1999, plaintiff filed a *pro se* complaint against Kodak, asserting causes of action for breach of contract, age discrimination, and handicap discrimination arising from Kodak's discharge of plaintiff. Plaintiff voluntarily dismissed that action, without prejudice, on October 29, 1999. Thereafter, plaintiff obtained counsel and refiled his complaint against Kodak on January 3, 2000. Plaintiff also named Shatzer as a defendant. Plaintiff's refiled complaint asserted claims for handicap discrimination in violation of R.C. 4112.02 and 4112.99, age discrimination in violation of R.C. 4112.14 and 4112.99, breach of implied contract, and the tort of wrongful discharge in violation of public policy. On March 16, 2000, defendants filed a motion to dismiss the age discrimination claim pursuant to Civ.R. 12(B)(1) on the grounds that the court lacked subject matter jurisdiction over that claim. On the same day, defendants filed a separate motion to dismiss the complaint pursuant to Civ.R. 12(B)(6) for failure to state a claim upon which relief could be granted. On June 8, 2000, the trial court granted defendants' motion to dismiss the age discrimination claim. On June 13, 2000, the trial court denied defendants' Civ.R. 12(B)(6) motion to dismiss. On October 10, 2000, defendants filed a summary judgment motion on the remaining three claims.

{¶29} On December 22, 2000, the trial court filed a decision and entry granting defendants' motion for summary judgment on all three claims. As to plaintiff's handicap discrimination claim, the court found:

{¶30} "Assuming that Plaintiff has demonstrated that an issue of fact exists concerning whether he is handicapped or was perceived to be handicapped and whether his employment was adversely affected by the handicap or perceived handicap, the Court still finds that Plaintiff has not set forth a *prima facie* case of handicap discrimination because he has not demonstrated that he could safely and substantially perform the essential functions of a Field Engineer."

{¶31} Plaintiff filed a timely notice of appeal as to the handicap discrimination claim only, asserting the following two assignments of error:

{¶32} "[1.] The trial court erred in granting the appellee-defendant's motion for summary judgment as to the appellant-plaintiff's claim for disability discrimination when there was a legitimate dispute of fact for a jury's consideration as to whether the plaintiff was handicapped and whether appellant could perform the essential functions of his position.

{¶33} "[2.] The trial court erred in granting the appellees-defendant's motion for summary judgment as to the appellant-plaintiff's claim for disability discrimination holding that appellees' actions in creating an 'undue hardship' relieved

appellees of the duty to accommodate a handicapped employee and made appellant's request for accommodation 'unreasonable.' "

{¶34} We address plaintiff's assignments of error together. Essentially, plaintiff argues that the trial court erred in granting defendants' motion for summary judgment in that genuine issues of material fact exist as to whether plaintiff demonstrated a prima facie case of handicap discrimination.

{¶35} An appellate court reviews a trial court's grant of summary judgment independently and without deference to the trial court's determination. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153. In reviewing a trial court's disposition of a summary judgment motion, an appellate court applies the same standard as that of the trial court. *Maust v. Bank One Columbus, N.A.* (1992), 83 Ohio App.3d 103, 107, 614 N.E.2d 765. Before summary judgment can be granted under Civ.R. 56(C), the trial court must determine that "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, citing *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267. Summary judgment is a procedural device to terminate litigation, so it must be awarded cautiously with any doubts resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358–359, 604 N.E.2d 138.

{¶36} Handicap discrimination in employment is prohibited by R.C. 4112.02, which read, at the time this case arose[3]:

{¶37} "It shall be an unlawful discriminatory practice:

{¶38} "(A) For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

{¶39} To establish a prima facie case of handicap discrimination under R.C. 4112.02(A), the party seeking relief must establish "(1) that he or she was handicapped, (2) that an adverse employment action was taken by an employer, at

---

**3.** Ohio's anti-discrimination statutes were amended on March 17, 2000, to refer to "disability" rather than "handicap." At the time the instant case arose, the statutes utilized the term "handicap."

least in part, because the individual was handicapped, and (3) that the person, though handicapped, can safely and substantially perform the essential functions of the job in question." *Columbus Civ. Serv. Comm. v. McGlone* (1998), 82 Ohio St.3d 569, 571, 697 N.E.2d 204, citing *Hazlett v. Martin Chevrolet, Inc.* (1986), 25 Ohio St.3d 279, 281, 25 OBR 331, 496 N.E.2d 478. The Ohio Supreme Court has held that Ohio courts may look to cases and regulations interpreting the American with Disabilities Act ("ADA") for guidance in interpreting Ohio's anti-discrimination statutes. Id. at 573, 697 N.E.2d 204.

{¶40} At the time the instant case arose, R.C. 4112.01(A)(13) defined "handicap" as follows:

{¶41} " 'Handicap' means a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment."

{¶42} The handicap discrimination statute was designed to protect those who live with a handicap that significantly affects the way they live their lives on a daily basis. *McGlone*, supra, at 571, 697 N.E.2d 204. As a consequence, not every physical or mental condition from which a person may suffer constitutes a handicap. See *Maloney v. Barberton Citizens Hosp.* (1996), 109 Ohio App.3d 372, 672 N.E.2d 223. Thus, a person alleging handicap discrimination must first demonstrate that he suffers from a physical or mental impairment that substantially limits one or more of his major life activities.

{¶43} In 1999, the United States Supreme Court decided a triology of cases interpreting the ADA. See *Sutton v. United Air Lines, Inc.* (1999), 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450; *Albertson's, Inc., v. Kirkingburg* (1999), 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518; and *Murphy v. United Parcel Serv., Inc.* (1999), 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484. In these cases, the Supreme Court made it clear that not every physical or mental impairment constitutes a disability, even though the person may have an impairment that involves one or more of his major life activities. This is so because the extent of the physical or mental impairment, regardless of its nature, must be substantially limiting. *Albertson's*, supra, at 563, 119 S.Ct. 2162, 144 L.Ed.2d 518. As the Supreme Court explained, "[t]he definition of disability also requires that disabilities be evaluated 'with respect to an individual' and be determined based on whether an impairment substantially limits the 'major life activities of the individual.'" *Sutton*, supra, at 483, 119 S.Ct. 2139, 144 L.Ed.2d 450. The Supreme Court further stated that the phrase "substantially limits" "is properly read as requiring that a person be presently—not potentially or hypothetically—

substantially limited in order to demonstrate a disability." *Sutton,* supra, at 482, 119 S.Ct. 2139, 144 L.Ed.2d 450. The Supreme Court further found:

{¶44} "* * * A 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not 'substantially limit' a major life activity." Id.

{¶45} In the instant case, plaintiff asserts that his handicap is "gastroesophageal reflux causing recurrent pulmonary problems becoming acute when exposed to cold air environments." At his deposition, plaintiff testified that the cold sensitivity occurred at times other than at work, but working in air-conditioned computer rooms housing the KOM equipment was the main source of irritation. When asked to describe how his alleged handicap affected him at work, plaintiff testified:

{¶46} "Air conditioning bothers me. Burning chest, coughing. Since I have the reflux, I could cough up stomach acid into my lungs. I get sinus infections which, if they get bad enough, I would have to take antibiotics, which, because I have got such a bad history with antibiotics, could be a very severe problem."

{¶47} As to how his condition affected him outside of work, plaintiff testified:

{¶48} "The same problems. We don't use the air conditioning at my house unless it is a last resort with my wife. Usually there is a lot of arguments about using it. The same in traveling in the car. Friend's house. It really doesn't make any difference where I am at. It has bothered me in shopping centers, wherever I happen to be at. Sometimes more than others, depending on the— usually the temperature difference in how close I am to the vents."

{¶49} Plaintiff further testified that his treatment plan consisted, generally, of avoiding air-conditioned environments and, when necessary, taking antibiotics, resting, and applying heat to his chest.

{¶50} In *Minnix v. Chillicothe* (C.A.6, 2000), 205 F.3d 1341, 2000 WL 191828, Minnix, a bus mechanic, alleged that his employment involved continual exposure to diesel exhaust fumes, resulting in a diagnosis of probable occupational-induced reactive airway disease and recurrent bronchitis. After a leave of absence due to breathing difficulties, Minnix returned to work with medical restrictions that his work area be properly ventilated. Shortly thereafter, Minnix's employer terminated him from his employment. After the termination, Minnix filed suit alleging that his termination was in violation of the ADA. The district court held that

Minnix failed to demonstrate a genuine issue of fact as to whether he was disabled, and the Sixth Circuit Court of Appeals affirmed. The courts rejected Minnix's claims that his major life activities of working and breathing were substantially limited due to his physical condition. With regard to the major life activity of breathing, the *Minnix* court found:

{¶51} "Minnix has not offered any probative evidence that his breathing condition is substantially limited. The record is entirely devoid of any medical evidence that would establish Minnix's breathing difficulties as severe, long term, or permanent. There is also ample evidence that Minnix can engage in many activities including working in the absence of diesel fumes. [Citation omitted.] Thus, it cannot be said that Minnix has shown a genuine issue of material fact as to whether his life activity of breathing is substantially impaired."

{¶52} With respect to the major life activity of working, the Sixth Circuit Court of Appeals explained:

{¶53} "The district court properly held that Minnix's major life activity of working is not substantially limited by his condition. Minnix testified that he is able to work, but that he cannot work in a job that would expose him to diesel fumes. This neither amounts to an inability to work nor a significant restriction as to the condition, manner, or duration under which Minnix can work. * * *" [Id.]

{¶54} The court also found support for the district court's determination that Minnix was not substantially limited as a result of his admissions that he could work in the garage given proper ventilation, that he could work on nondiesel equipment, and that he had actively sought various other employment positions. Id.

{¶55} The Ohio Supreme Court has also discussed what factors should be considered in determining whether a person is substantially limited in the major life activity of working. In *McGlone*, supra, the Ohio Supreme Court, citing Section 1630.2(j)(3), Title 29, C.F.R., stated:

{¶56} "'* * * 'The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. *The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.*' " (Emphasis sic; id. at 573, 697 N.E.2d 204.)

■ {¶57} In the instant case, there is no indication, medical or otherwise, that plaintiff's pulmonary problems substantially limit his major life activities of breathing or working. With regard to breathing, plaintiff's own testimony establishes that his alleged condition is not "presently" limiting in any respect.

He testified that as a result of his sensitivity to cold air drafts, he gets "sinus infections which, *if* they get bad enough, I would have to take antibiotics, which * * * *could* be a serious problem." (Emphasis added.) Plaintiff's testimony establishes nothing more than that his impairment, i.e., sensitivity to cold air drafts, *may* cause sinus infections, which *may* require antibiotics, which *may* in turn cause a serious problem. Further, plaintiff testified that his treatment plan consisted generally of avoiding air-conditioned environments. Thus, it is clear that plaintiff's impairment may be corrected simply by taking measures to avoid environments with cold air drafts. No evidence establishes that plaintiff has difficulty breathing when not in air-conditioned or otherwise cold air environments, or even that being in such cold air environments always results in breathing difficulties.

{¶58} The medical evidence further negates plaintiff's contention that his impairment substantially limits his major life activity of breathing. None of Dr. Brandes's medical reports establish that plaintiff's breathing problems are severe, long term, or permanent. In January 1994, Dr. Brandes imposed no medical restrictions and merely stated that cold weather aggravated his "throat & lung problems." In April 1994, Dr. Brandes stated that plaintiff's cold air sensitivity would last only for a year and again imposed no medical restrictions. In June 1994, Dr. Brandes imposed a restriction only that plaintiff avoid cold air drafts because the drafts were "bothersome." In mid 1996, Dr. Brandes indicated that plaintiff had "no specific pulmonary problem" other than a sensitivity to cold air drafts which tended to set off his cough. In October 1996, Dr. Brandes indicated that plaintiff had had few problems with his sensitivity in 1995 and 1996. Accordingly, he lifted plaintiff's work restrictions and indicated that he could return to unrestricted activities. Although plaintiff contends that Dr. Brandes lifted the restrictions only because plaintiff implored him to do so, Nurse Davis's affidavit establishes that she confirmed with Dr. Brandes, both verbally and in writing, that he had properly lifted plaintiff's restrictions. Plaintiff has offered no evidence to contradict Nurse Davis's affidavit. In addition, the record contains no medical evidence establishing that plaintiff's restrictions were ever reinstated. The February 28, 1997 note from Dr. Brandes, obtained by plaintiff after he was terminated from his employment, indicates only that plaintiff's "problem" is "sensitivity to cold and cold drafts which produce chest discomfort" and that plaintiff "tries to avoid these situations."

{¶59} With regard to the major life activity of working, there is no evidence that plaintiff's condition disqualified him from performing a class of jobs or a wide range of jobs. See *McGlone*, supra. Plaintiff testified that he continued to work for Kodak servicing computer equipment after the medical restrictions were imposed. Although plaintiff was restricted from servicing KOM equipment, he

was able to service all non-KOM products in the BIS division. Further, plaintiff testified that, since his termination from Kodak, he continues to work in his general field of servicing and/or repairing computers, but does not work in computer room environments similar to those which housed the KOM equipment. Plaintiff's testimony establishes only that he is unable to perform a single, particular job (that of servicing computer equipment housed in highly air-conditioned environments), but is not significantly restricted in his ability to service and/or repair computer equipment in other types of environments.

{¶60} On the record before us, this court finds that plaintiff has failed to raise a genuine issue of material fact as to whether plaintiff's physical impairment substantially limits his major life activities of breathing and/or working.

■ {¶61} We further find that plaintiff has not demonstrated a genuine issue of material fact as to whether Kodak regarded him as being handicapped. Pursuant to R.C. 4112.01(A)(13), even if a person is not handicapped, he can receive the protection of the handicap discrimination laws if he is "regarded [by his employer] as having a physical or mental impairment." Plaintiff bases his claim that Kodak "regarded" him as being handicapped solely on the fact that Kodak recognized his physical impairment and provided an accommodation for it. In *Plant v. Morton Internatl.* (C.A.6, 2000), 212 F.3d 929, the Sixth Circuit Court of Appeals rejected Plant's contention that he was "regarded" as disabled under the ADA or handicapped within the meaning of Ohio's handicap discrimination law where his only evidence was "because [the employer] made accommodations for [his] medical restrictions." The court found that "[plaintiff] cannot show that [the 'regarded as'] provision applies to him merely by pointing to that portion of the record in which his supervisor admitted that he was aware of [plaintiff's] medical restrictions and modified [plaintiff's] responsibilities based on them." Id. at 938. The same result is compelled in the instant case. Plaintiff's contention that Kodak was aware of his medical restrictions and provided an accommodation for them is insufficient to demonstrate that Kodak "regarded him" as being handicapped.

{¶62} For the foregoing reasons, we find that plaintiff has failed to demonstrate a genuine issue of material fact establishing that he is "handicapped" as defined in R.C. 4112.01(A)(13).

■ {¶63} Even assuming that plaintiff had demonstrated a genuine issue of material fact as to whether or not he is handicapped, plaintiff must also establish that adverse employment actions were taken based, at least in part, upon the handicap. See *Beauchamp v. CompuServe, Inc.* (1998), 126 Ohio App.3d 17, 22, 709 N.E.2d 863. Plaintiff contends that Kodak engaged in two separate adverse job actions against him based, at least in part, upon his handicap. Specifically,

plaintiff first argues that in October 1996, Kodak "compelled" him to choose between either the loss of his job or "the loss of Kodak's previously provided reasonable accommodation to his impairment of not requiring him to work in the Komstar environment." Plaintiff further argues that Kodak terminated him after he "expressed to Appellee Shatzer that his medical restrictions and accommodation would have to be brought back and his unwillingness to leave immediately for 9 week[4] [*sic*] of training on Komstar, the very source of his restrictions." (Footnote added.)

{¶64} Upon review of the record, we cannot find that a genuine issue of material fact exists as to whether Kodak's inquiry into the possibility of plaintiff's medical restrictions being lifted constituted an adverse employment action taken based upon plaintiff's alleged handicap. When Kodak first accommodated plaintiff's medical restrictions, plaintiff was advised that business conditions at that time allowed Kodak to make the accommodation, but that the situation could change based on fluctuating business conditions. Further, it was Kodak's practice to continually monitor and secure updated medical verification for any medical restrictions. The mere fact that Kodak did not require plaintiff to service the KOM equipment and/or participate in the "standby" program for more than two years did not convert the temporary accommodation into a permanent one.

{¶65} In addition, it is undisputed that at the time plaintiff was questioned about his medical restrictions, Kodak was undergoing a downsizing that left only plaintiff and one other field engineer with KOM experience. According to the affidavit testimony of Shatzer and O'Brien, plaintiff was questioned about his current medical status so that Kodak could determine possible work options for plaintiff if he could not service the KOM equipment. Again, plaintiff argues that Dr. Brandes lifted plaintiff's medical restrictions only because he was asked to do so by plaintiff. As we have previously noted, however, the evidence establishes that plaintiff was specifically advised in writing that the only reason Kodak asked for an update of his medical status was to determine possible work options for him if he could not service KOM products. Also, plaintiff has offered nothing to contradict Nurse Davis's affidavit statement that she confirmed with Dr. Brandes, both verbally and in writing, that plaintiff needed no accommodation. After receipt of O'Brien's letter and Kodak's verification that Dr. Brandes's lifting of the medical restrictions was properly made, plaintiff did not seek to have the medical restrictions reinstated and continued working in the Columbus BIS division.

---

**4.** The record establishes that the March 1997 training for which plaintiff was scheduled was a seven-week, not nine-week course.

{¶66} We further find no genuine issue of material fact with regard to plaintiff's second contention, i.e., that he was terminated from his employment with Kodak based, in part, upon his handicap.

{¶67} In November 1996, after plaintiff's medical restrictions were lifted, he requested training to refamiliarize himself with the KOM equipment. Plaintiff was eventually informed that he had been scheduled to attend a seven-week training course in Rochester, New York; however, he refused to attend the training for reasons unrelated to his medical condition. While plaintiff argues that he was terminated as a result of his statement to Shatzer that plaintiff might have to have his medical restrictions reinstated, the evidence does not support such contention. Rather, the evidence establishes that plaintiff's reasons for refusing to attend the training were of a personal nature and that plaintiff was terminated because he refused to attend the training. During his deposition, plaintiff testified that he refused to attend the training because he did not want to miss any of his son's school activities and that his wife simply said he did not have to go. Both Shatzer and Hein corroborated plaintiff's deposition testimony. In addition, in his response to defendant's first set of interrogatories filed in the original complaint, plaintiff set forth the following seven reasons for refusing to attend the training:

{¶68} "(1) The training was to be for seven weeks, instead of two or three days as plaintiff had anticipated.

{¶69} "(2) He was informed of the training only two working days prior to the start date.

{¶70} "(3) He did not think that he needed the entire seven-week training, as he had completed the same training previously.

{¶71} "(4) Since requesting a refresher course, he had been working on the KOM equipment for two to three months and thus a refresher course was no longer necessary.

{¶72} "(5) It made more sense to train additional personnel on the KOM equipment and not waste the class on someone who had already taken it.

{¶73} "(6) His mother-in-law had recently moved into his house.

{¶74} "(7) His son was graduating from high school and he did not want to miss his son's school activities."

{¶75} According to Shatzer's deposition testimony, after plaintiff informed Shatzer of his refusal to attend the training, Shatzer told plaintiff that such refusal could have serious consequences. When plaintiff again indicated that he would not attend the training, Shatzer told him he would contact him later to let him know what the consequences of the refusal would be. Shatzer did

not tell plaintiff at that time that his refusal to attend the training would result in his termination because Shatzer did not have the authority to make such a decision on his own. Shatzer then telephoned O'Brien and informed him of the conversation he had had with plaintiff. According to Shatzer, he and O'Brien discussed the fact that plaintiff "was being insubordinate in refusing to do something that he was instructed to do," and that the matter needed to be discussed further with personnel from the human resources department. Ultimately, Shatzer was informed that plaintiff was to be terminated for his refusal to attend the training. It is well established that even a qualified handicapped person can be discharged for legitimate nondiscriminatory reasons. As explained by the Ohio Supreme Court in *Hood v. Diamond Products, Inc.* (1996), 74 Ohio St.3d 298, 302, 658 N.E.2d 738: "legitimate, nondiscriminatory reasons for the action taken by the employer may include, but are not limited to, insubordination on the part of the employee claiming discrimination." The evidence of record establishes that plaintiff was terminated from his position with Kodak for insubordination—a legitimate, nondiscriminatory reason under *Hood,* supra.

{¶76} For the foregoing reasons, we find that plaintiff has failed to demonstrate a genuine issue of material fact with regard to whether Kodak took adverse employment action against plaintiff based in part because plaintiff was handicapped.

{¶77} Finally, even assuming that plaintiff has demonstrated genuine issues of material fact as to the first two prongs of a handicap discrimination claim, plaintiff must also establish that, in spite of his handicap, he can safely and substantially perform the essential functions of his former position with reasonable accommodations.

{¶78} Ohio Adm.Code 4112–5–02(A) defines "accommodation" as applied to employers, as "a reasonable adjustment made to a job and/or the work environment that enables a qualified disabled person to safely and substantially perform the duties of that position." A handicapped employee who claims that he is otherwise qualified with a reasonable accommodation " 'bears the initial burden of proposing an accommodation and showing that the accommodation is objectively reasonable.' " *Darovich v. Gen. Motors Corp.* (Feb. 24, 2000), Cuyahoga App. No. 75859, unreported, 2000 WL 217766, quoting *Cassidy v. Detroit Edison Co.* (C.A.6, 1998), 138 F.3d 629, 634. "Reasonable accommodations include but are not limited to job restructuring, acquisition or modification of equipment or devices, realignment of duties, revision of job descriptions or modified, part-time work schedules, transfer, reassignment or hire into vacant positions." Id., citing *Wooten v. Columbus* (1993), 91 Ohio App.3d 326, 333, 632 N.E.2d 605.

{¶79} Once a handicapped employee has proposed an objectively reasonable accommodation, an employer is required to explore methods and alternatives to reasonably accommodate the disabled employee prior to taking adverse action against the employee. *Darovich*, supra. The burden then shifts to the employer to demonstrate that it cannot reasonably accommodate the handicapped employee due to undue hardship. Id. "An employer must make reasonable accommodation in the disability of an employee * * * unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business." Ohio Adm.Code 4112–5–08(E)(1). An employer is not required to create a position or make work for a handicapped employee. *Darovich*, supra.

{¶80} In the trial court proceedings, Kodak maintained that, with respect to the training issue, plaintiff never requested any type of accommodation based upon his alleged handicap. The trial court determined initially that an issue of fact existed regarding whether plaintiff requested an accommodation when he (1) requested to attend the KOM training for a shorter period of time, and (2) indicated that he may have to resume his medical restrictions. Having so found, the court further held that it must then be determined whether any requested accommodation was "related to Plaintiff's handicap and reasonable in nature." The court concluded that plaintiff's request for a shorter training period was not related to his alleged handicap; however, the court found that plaintiff's suggestion that he might need to resume his medical restrictions was related to his alleged handicap. The trial court ultimately determined, however, that plaintiff's requested accommodation (that he be excused from working on the KOM equipment) was not objectively reasonable, as it would have imposed undue hardship on Kodak. We agree.

{¶81} Plaintiff contends that his request was reasonable since Kodak had provided the same accommodation for over two years after his initial illness. Kodak asserts that servicing KOM equipment was an essential function of the position of field engineer and that it had no duty to eliminate this function in order to accommodate plaintiff. Kodak further asserts that although it was able to provide plaintiff such accommodation for a period of time, subsequent personnel changes made it impossible to excuse plaintiff from servicing the KOM equipment without incurring undue hardship on Kodak.

{¶82} An employer is under no obligation to provide an accommodation that would eliminate an essential function of a job. *Gilbert v. Frank* (C.A.2, 1991), 949 F.2d 637, 642. Essential functions generally mean the fundamental duties of the position in question, not functions that are merely marginal. *Mitchell v. Washingtonville Cent. School Dist.* (C.A.2, 1999), 190 F.3d 1, 7.

{¶83} As previously noted, prior to plaintiff's illness, approximately six field engineers worked in the BIS division, three of whom, including plaintiff, were trained to work on the KOM equipment. In 1994, Kodak agreed to excuse plaintiff from servicing the KOM equipment in order to accommodate his health problems. Plaintiff was informed that business conditions at that time allowed Kodak to make such an accommodation, but that as those conditions changed, it might be necessary to train plaintiff on other product lines and/or adjust his working hours to better accommodate the restrictions.

{¶84} In the fall of 1996, Kodak laid off two of the field engineers with KOM equipment training. As a result, only plaintiff and one other field engineer remained trained to service the KOM equipment. It is thus clear that Kodak's personnel situation had changed dramatically from 1994 when it first provided plaintiff an accommodation. Plaintiff's own witness, Edward Murdock, attested by affidavit that Kodak was in "a bind needing people to work on Komstar." While servicing KOM equipment might not have been an essential function of his job when plaintiff first became ill, as there were other members of the BIS team who could perform that function, it clearly became an essential function of plaintiff's job after the layoffs in the fall of 1996. Plaintiff argues that the question of whether a function is "essential" is typically a question of fact for a jury. However, the case cited by plaintiff in support of this proposition, *Brickers v. Cleveland Bd. of Edn.* (C.A.6, 1998), 145 F.3d 846, actually illustrates that the question of "essentialness" may properly be a question of law for the court. Id. at 849. In *Brickers,* the Sixth Circuit Court of Appeals found as a matter of law that lifting was an essential function of a school bus attendant's position and that the plaintiff, who claimed that she was unable to lift, therefore failed to make out a prima facie case of handicap discrimination. Further, we agree with the trial court that under the circumstances presented, no rational trier of fact could find that servicing the KOM equipment was not an essential function of plaintiff's job in 1996. Thus, plaintiff's proposed accommodation was not objectively reasonable given the situation in Kodak's Columbus BIS division in October 1996.

{¶85} Finally, we note that the burden was upon plaintiff to propose an objectively reasonable accommodation to Kodak, rather than upon Kodak to proffer one to him. *Cassidy,* supra. The record demonstrates that plaintiff proposed no other accommodation, such as transfer to a vacant position. Accordingly, this court finds that plaintiff has failed to establish a genuine issue of material fact as to whether, in spite of his handicap, he could safely and substantially perform the essential functions of field engineer with reasonable accommodations.

{¶86} For all the foregoing reasons, this court finds that plaintiff has failed to set forth a prima facie case of handicap discrimination. Accordingly, the trial

court did not err in granting summary judgment in favor of defendants. Plaintiff's two assignments of error are therefore overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

Judgment affirmed.

DESHLER and BROWN, JJ., concur.