76 F.3d 378
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Sheila BUCHKO, M.D., Plaintiff-Appellant,
v.
The CITY HOSPITAL ASSOCIATION, an Ohio Corporation,
Defendant-Appellee.
 No. 94-4064.
 United States Court of Appeals, Sixth Circuit.
 Jan. 29, 1996.
 
 Before: KEITH, DAUGHTREY and PHILLIPS*, Circuit Judges.
 PHILLIPS, Senior Circuit Judge:
 
 
 1
 Dr. Sheila Buchko (Buchko) appeals from a district court order granting summary judgment to City Hospital Corporation of East Liverpool, Ohio (Hospital) in this diversity case in which she alleged claims of breach of contract, defamation, and tortious interference with a third-party contract, all growing out of an incident involving Buchko and one of Hospital's administrators which culminated in Buchko's loss of her job as an emergency room physician. We affirm the grant of summary judgment on the breach of contract claim, but vacate and remand for further proceedings on the tortious interference and defamation claims.
 
 
 2
 * Hospital contracts with a California partnership, Fischer Mangold (FM), to staff its emergency room with doctors. FM recruits the doctors, contracts with them, assigns them to hospitals, and schedules them each month. Hospital is not a party to FM's contracts with its doctors but receives the services of FM doctors through its own contract with FM.
 
 
 3
 Buchko signed on with FM and began working at the hospital in July of 1992. She worked there largely without incident until the events of April, 1993, when in the pre-dawn hours Buchko found herself in a conflict with a psychiatric nurse and the nursing supervisor for that shift over the admission of a psychiatric patient. The hospital had a policy against admitting psychiatric patients whose blood alcohol level exceeded a certain amount, and this patient had admitted to drinking a couple of beers some hours before his arrival at the hospital. Buchko determined that the patient showed no signs at all of intoxication and so refused the psychiatric nurse's request that she order a blood alcohol test. Buchko continued to refuse to order the test until the nursing director for that shift, a Nurse Evans, called the administrator on call, Assistant Administrator Patricia Eltringham. In response, Eltringham told Evans to have the hospital's psychiatrist, Dr. Kaza, order the test (J.A. 108), which he did, although no one contends that Buchko had made an inappropriate medical decision in the circumstances.
 
 
 4
 Believing that the nurses had reported to Eltringham that she was violating hospital policy and state law, Buchko called Eltringham on her beeper while, as it happened, Eltringham and Evans were on the phone. J.A. 227-28, 232-33. Eltringham, feeling that the situation had been taken care of, did not return Buchko's call. J.A. 104. This upset Buchko who, during her shift and after, continued in the emergency room openly to voice her displeasure with Eltringham's failure to return her call. J.A. 239-43.
 
 
 5
 When Eltringham returned to work, probably that Monday, April 12, she heard that Buchko had continued to complain about her conduct after the incident had otherwise passed on Saturday morning. Then, within a couple of days after April 12, Eltringham spoke on the phone to Chris Appelbaum, FM's manager for Hospital's contract. J.A. 115-17. During that conversation, Eltringham described at least some of the April 10 incident and either (1) merely noted that Buchko later had behaved disruptively by complaining publicly about Eltringham's rudeness (J.A. 117-18, 126) or (2) accused Buchko of violating hospital policy and state law and of disrupting hospital operations (J.A. 248-49), perhaps with the intent and effect of having FM remove her from her position in the hospital's emergency room.
 
 
 6
 On April 15, soon after that phone conversation, Appelbaum called Buchko in the emergency room and either (1) had a general conversation with Buchko in which Buchko reiterated old and continuing frustrations with her job and then voluntarily offered her resignation (J.A. 158-59) or (2) told Buchko that Eltringham had accused her of violations of policy, violations of law, and disruptive behavior and, consequently, presented her with the alternatives of resigning or being terminated[1] (J.A. 248-49).
 
 
 7
 Buchko later had a number of conversations with hospital staff and employees about the incident and about the possibility that she would lose her job. J.A. 246, 252-53, 256-59, 263-65, 275-81. She also wrote a letter to Eltringham and another administrator explaining her concerns and asking for a meeting. Eltringham responded by scheduling a meeting for May 24, at which Buchko was able to speak her mind in the presence of Eltringham and other hospital officials. Eltringham followed that meeting with a letter of May 26, in which she agreed that Buchko had not violated hospital policy but reiterated her belief that Buchko's refusal to let the original incident die on the morning of April 10 and since then was inappropriately "disruptive." J.A. 476-77. Eltringham sent a copy of this letter to everyone who had attended the meeting as well as to Appelbaum at FM.
 
 
 8
 Buchko did not speak to Appelbaum again but simply found herself off the emergency room schedule as of the end of July, either because she had resigned--according to Appelbaum--or because she had been terminated--according to Buchko.
 
 
 9
 Buchko then brought this diversity action against Hospital. In it, she alleged that Eltringham's telephone conversation with Appelbaum and her follow-up letter of May 26, 1993 constituted defamation and tortious interference with her contractual relations with FM. She also claimed that Hospital's failure to accord her a pre-discipline hearing as allegedly required by Hospital by-laws before Eltringham's "disciplinary" action constituted breach of contract.
 
 
 10
 After discovery, the hospital moved for summary judgment. Buchko's counsel failed to note the deadline for responding to the motion under local rules and filed his response more than two weeks late, a full week after the district judge had entered judgment for the hospital on all three claims. Buchko's counsel then moved for reconsideration under Fed.R.Civ.P. 60(b), but the district court denied the motion. This appeal, in which Buchko challenges both the district court's grant of summary judgment on the merits and its later denial of her motion for reconsideration, followed.
 
 II
 
 11
 We consider first the propriety of the district court's order denying Buchko's motion under Rule 60(b), Fed.R.Civ.P., for relief from the court's grant of summary judgment following Buchko's failure to make timely response to the motion. We review that order for abuse of discretion. See Whitaker v. Associated Credit Services, 946 F.2d 1222, 1224 (6th Cir.1991).
 
 
 12
 The motion sought relief simply in the interest of justice, pleading in effect excusable neglect by Buchko's attorney in failing to know of, hence to observe, the admittedly controlling local rule, and lack of prejudice to Hospital. It was supported by a proffered response to the summary judgment motion and sought to add to the record certain discovery materials not filed with Hospital's motion. The relief sought, were we to find abuse, would be a vacatur of the summary judgment and remand for reconsideration on the basis of the belatedly-filed response papers.
 
 
 13
 We cannot find abuse of discretion in the district court's refusal to excuse failure to comply with a local rule for no other reason than conceded ignorance of the rule by counsel. See, e.g., Bohlin Co. v. Banning Co., 6 F.3d 350, 357 (5th Cir.1993) ("ignorance of the rules ... insufficient" as basis for relief under Rule 60(b)). That order therefore stands as we turn to consideration of the merits of the grant of summary judgment.
 
 III
 
 14
 At the outset, we confront a potential procedural problem concerning the proper scope of our review. It arises from the failure of Buchko as non-movant to make timely response to the motion for summary judgment, followed by the district court's discretionary decision, which we have affirmed, not to allow a belated response. The result was that in ruling upon the summary judgment motion the district court had before it only Hospital's motion papers and those portions of the discovery materials that Hospital had filed to support its motion. See Fed.R.Civ.P. 56(c).
 
 
 15
 Such a procedural development (which, fortunately, seldom occurs) can raise a host of difficult questions respecting the power--and obligation--of the district court in the first instance, and the court of appeals in review, to consider any portions of the summary judgment materials on file other than those specifically referenced and relied upon by the movant as support for its motion. See Guarino v. Brookfield Twp. Trustees, 980 F.2d 399, 403-07 (6th Cir.1992) (problems identified and discussed). Fortunately, we are spared any of the potential difficulties that might be present in this case by counsels' agreement in oral argument that our de novo review might properly take into account all the materials on file when summary judgment was entered in the district court.
 
 
 16
 We therefore proceed to consider the claims on that basis, taking them in order.
 
 IV
 A.
 
 17
 We first consider Buchko's claim of tortious interference with her contractual relations with FM.
 
 
 18
 Under Ohio law, which controls in this diversity case, liability for tortious interference attaches when "one, who is without privilege, induces or purposely causes a third person to discontinue a business relationship with another." Wolf v. McCullough-Hyde Memorial Hospital, Inc., 586 N.E.2d 1204, 1208 (Ohio Ct.App.1990). The elements of the prima facie case therefore are "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." Id. In determining whether the conduct may, however, have been "privileged" or justified, hence not that of a "wrongdoer," the following factors are to be considered: "(a) the nature of the actor's conduct; (b) the nature of the expectancy with which his conduct interferes; (c) the relation between the parties; (d) the interest sought to be advanced by the actor; and (e) the social interest in protecting the expectancy on the one hand and the actor's freedom of action on the other hand." Id. at 1209 (citation and internal quotes omitted). And where, as in this case, the relationship between the alleged interferer and the claimant is an employment relationship, the question whether an intentional "interference" was privileged turns on whether it was done within the scope of the interferer's employment duties vis-a-vis the claimant. See Contadino v. Tilow, 589 N.E.2d 48, 50-51 (Ohio Ct.App.1990) (whether supervisor's employment duties included duty to report concerns about former subordinate to employer determinative of tortious interference claim).
 
 
 19
 As the claim in this case was presented for summary judgment ruling by the district court, it was indisputable on the record that there was a business relationship between Buchko and FM; that Eltringham (hence Hospital) knew of it; that it was terminated; and that Buchko suffered injury from the termination. This left as potentially genuine issues of material fact: (1) whether Eltringham's conduct intentionally caused the termination, and if so (2) whether Eltringham's conduct was nevertheless "privileged." Hospital's motion clearly sufficed to place upon Buchko the burden of demonstrating that there were genuine issues respecting both of these material facts. If, as a matter of law on facts not in genuine issue, Eltringham's conduct did not cause the termination or if her conduct was privileged because within her employment duties, Hospital was entitled to summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-3 (1986).
 
 
 20
 The district court ruled that the summary judgment record failed to disclose any genuine issue as to whether Eltringham's conduct caused Buchko's termination, holding that on the undisputed facts of record it did not. Specifically, the court opined that Appelbaum's deposition "reveals that Buchko herself terminated her relationship with [FM] shortly after Eltringham and Appelbaum had talked about her," and further, that there was an "absence of any evidence to the contrary from Buchko," J.A. 581, so that, "[t]aking Appelbaum's testimony as true, absent any evidence to the contrary presented by Buchko, this court finds that [FM], through Appelbaum, did not terminate Buchko's employment as a result of the conversation with Eltringham." Id. at 582. On this basis, because Buchko could not prove the essential causation element of her claim, the court held that Hospital was entitled to judgment as a matter of law, and summary judgment was appropriate.
 
 
 21
 We must disagree with this assessment of the summary judgment record. Perhaps--though we can only surmise--the court narrowly confined its assessment to only those portions of the record specifically referenced by Hospital in its motion papers, declining to consider any other. Whatever the reason, we are satisfied that an assessment of all the materials then "on file" reveals genuine issues respecting both the causation element and the existence of any privilege that might have avoided liability. A fairly brief analysis--centering on some portions of the record not referred to by the district court--suffices to demonstrate this.
 
 
 22
 Although Eltringham and Appelbaum both deposed that their phone conversation had nothing to do with Buchko's departure, that Eltringham made no attempt to cause her termination, and that Buchko resigned voluntarily, Buchko's deposition presents an entirely plausible alternative scenario supporting her claim. She deposed that going into the April 10 incident, she already was fearful for her position because of a developed background of touchy hospital politics in which some of Hospital's nurses had accused her of violating policy and law, and that she knew how sensitive FM was to such transgressions and to administrators' opinions of them. J.A. 227-28, 232-33, 245. Then, according to Buchko, five days after the incident and out of the blue, Appelbaum called her in the emergency room and said that an administrator (later established to have been Eltringham) had told Appelbaum that Buchko had violated hospital policy and state law. Further, Buchko deposed, Appelbaum then stated in a highly distressed manner that Buchko's continued presence at the hospital would endanger FM's contract with the hospital so that it was best that Buchko go. J.A. 248-49. According to Buchko, this telephone call was overheard and its gist understood by several people in the emergency room who rapidly spread the word of Buchko's being threatened with termination.
 
 
 23
 In a follow-up telephone call eight days later (April 23), according to Buchko, Appelbaum again expressed fear of losing the contract with the hospital and told Buchko to resign or be terminated. J.A. 260-62. Further, Buchko deposed that at the May 24 meeting--which Buchko requested in part because she feared for her job--Eltringham denied, though she later conceded, making the original phone call to Appelbaum. J.A. 285-86. Buchko's deposition continued that when Eltringham's post-meeting letter continued to accuse Buchko of disruption, Buchko called Appelbaum repeatedly to discuss the situation, but never got a return call. J.A. 288-89.
 
 
 24
 Portions of the depositions of Eltringham and Appelbaum, when read in the light most favorable to Buchko, tend to corroborate key aspects of Buchko's account. Eltringham conceded that she did indeed mention Buchko's disruptiveness in the first April telephone conversation, though she could not recall mentioning any violation of hospital policy or of state law. J.A. 117-19. Appelbaum's deposition does not deny Eltringham's having mentioned a violation of hospital policy to her, asserting only that she could not recall whether Eltringham had done so. J.A. 156.
 
 
 25
 Further corroboration of some elements of Buchko's version can be found in the deposition of Dr. Robert Solomon, an FM doctor and the medical director of the emergency room. Solomon deposed that Herschel Fischer, one of the principals of FM, made a point of saying to him in the course of this unfolding incident, that Solomon's job was to satisfy administrators such as Eltringham, not to tell them that he would talk collegially to Buchko about better ways to handle such situations in the future. J.A. 554. Finally, Solomon deposed that in his view of the matter, the appropriate, if not necessarily exclusive, way for Eltringham to have handled the situation would have been for her to come to him rather than talking to FM headquarters about it first. J.A. 561.
 
 
 26
 From this evidence, if Buchko's credibility were accepted, a factfinder reasonably could find that Buchko did not resign but had her contract involuntarily terminated by Appelbaum for FM; that the main cause of that termination was Eltringham's accusations of improper conduct to Appelbaum; that those accusations were false to the extent they claimed violations of hospital policy and/or state law and were made with full knowledge of the potential consequences for Buchko and perhaps with the purpose of seeing Buchko terminated. We therefore conclude that there were genuine issues of material fact respecting the cause of Buchko's termination and that the district court erred in its conclusion that there were not.
 
 
 27
 Because the district court thought that it was indisputable on the summary judgment record that Buchko's termination was a voluntary resignation rather than an involuntary discharge caused by Eltringham's "interference," it did not reach the question whether Eltringham's conduct may in any event have been "privileged." Addressing that question in the first instance, we conclude that there are genuine issues of fact respecting the matter that preclude the grant of summary judgment on that alternative basis.
 
 
 28
 As indicated, when under Ohio law an alleged "interferer" with another's contractual relationships has an employment relationship with the other, the question of privilege is essentially one of whether the "interferer's" employment duties included the duty to report the perceived derelictions of the other person to outsiders having a contractual relationship with that person. If so, and if the report was neither intentionally nor recklessly false, making such a report would be privileged. If there is no such duty, or if in the particular case, it is improperly performed, such a report would not be "privileged." See Contadino, 589 N.E.2d at 50-51.
 
 
 29
 We think that there are genuine issues of fact respecting the exact nature of Eltringham's employment duties vis-a-vis Buchko and FM that preclude summary judgment on that alternative basis. On the evidence as forecast in the summary judgment record, a trier-of-fact reasonably could find--though surely it need not--that Eltringham's conduct in reporting Buchko's perceived derelictions directly to FM was outside the scope of her employment duties with Hospital. Accordingly, we must vacate the grant of summary judgment on that claim and remand it for further proceedings.
 
 B.
 
 30
 We next consider the defamation claim, which, as alleged, essentially paralleled the tortious interference claim, treating Eltringham's allegedly false report to Appelbaum as the defamation.
 
 
 31
 Under Ohio law, "[d]efamation is the unprivileged publication of a false and defamatory matter about another." McCartney v. Oblates of St. Francis deSales, 609 N.E.2d 216, 222 (Ohio Ct.App.1992). But, where the relationship between the parties is "such as to afford reasonable ground for supposing an innocent motive for giving information, and to deprive the act of an appearance of officious intermeddling with the affairs of others," a qualified privilege to give the information exists. Hahn v. Kotten, 331 N.E.2d 713, 720 (Ohio 1975) (citations and internal quotes omitted). Such a privilege may be found where the allegedly defamatory statement concerned only "matters of common business interest between the parties." Evely v. Carlon Co., 447 N.E.2d 1290, 1292 (Ohio 1983) (statements by company officials respecting activities of claimant arising out of his employment status with company). But, where such a privilege is found to exist, it is a qualified one that does not give protection if the otherwise privileged statements were made with actual malice. Id.; Contadino, 589 N.E.2d at 52. It is the claimant's burden, once privilege is established, to avoid its force by proving actual malice, and this can only be done by clear and convincing evidence that "the defendant published the defamatory statement either with actual knowledge that the statement was false, or with a high degree of awareness of its probable falsity." Varanese v. Gall, 518 N.E.2d 1177, 1180 (Ohio 1988); see also, Lansdowne v. Beacon Journal Publishing Co., 512 N.E.2d 979, 984 (Ohio 1987).
 
 
 32
 Hence, in assessing whether summary judgment was warranted in this case, the potential issues of material fact were whether the statements ascribed to Eltringham were in fact made; if so, whether they were false and defamatory; if so, whether they were nevertheless made under a qualified privilege; and if so, whether they were, however, made with actual malice.
 
 
 33
 The district court gave short shrift to the claim, ruling simply that as a matter of law "[on] the Hospital's uncontradicted evidence ... the statements in question were not false," and hence, that "Buchko's claim must fail." J.A. 583-84. The court therefore did not address any of the other potential issues.
 
 
 34
 Again, as to this claim, we must disagree with the district court's assessment of the summary judgment record on this issue. The allegedly defamatory statements included assertions that Buchko's conduct violated state law and hospital policy.[2] It is actually undisputed that, if made, these particular statements were false; Eltringham has in fact conceded that no violation of hospital policy was involved. J.A. 476-77. The district court therefore erred in holding to the contrary and on that basis alone granting summary judgment.
 
 
 35
 Though the district court, having so ruled, did not address any of the other potential issues, we must do so in order to complete our de novo review. First, we observe that there obviously is a genuine issue of fact, essentially one of credibility, as to whether the statements were actually made. Next, we conclude that, as a matter of law on the undisputed facts of record, the statements, if made, were defamatory in the context made. See Rogers v. Buckel, 615 N.E.2d 669, 672-73 (Ohio Ct.App.1992) ("Defamation is a false publication causing injury to a person's reputation ... or affecting him adversely in his trade or business." (citations and internal quotes omitted)). Further, it is indisputable that if the statements were made, they caused some compensable harm to Buchko, though the nature and amount of any damages are of course material facts in genuine issue on the present record. Next, we hold as a matter of Ohio law that any statements made by Eltringham to Appelbaum respecting Buchko's perceived misconduct were made with qualified privilege by virtue of the business relationships between the various actors. See Evely, 447 N.E.2d at 1292. Finally, we consider whether on the present summary judgment record there are genuine issues of fact respecting the issue of actual malice. In doing so, we must take into account that Buchko's burden of persuasion as to that issue is a heightened one requiring her to establish it by clear and convincing evidence. See Anderson v. Liberty Lobby, 477 U.S. 242, 257 (1986) (heightened proof burden must be factored into summary judgment assessment). On the present record, taking the heightened proof burden into account, we could not hold that a reasonable jury could not find actual malice proved "with convincing clarity." Id. The issue essentially would be one of credibility. If Buchko's testimony were believed--that false and serious accusations of misconduct violative both of law and hospital policy were made to her employer--we think a jury rationally could accept this as clear and convincing evidence that they were made with actual malice, given the relationships and circumstances involved. Of course, a jury might either disbelieve Buchko or it might fail to think the further inference of actual or constructive knowledge of the statement's falsity sufficiently proven. But the question for us is only whether the evidence going to that issue as now forecast is sufficient to make it one for the trier-of-fact.
 
 
 36
 Accordingly, we must vacate the grant of summary judgment on the defamation claim and remand it for further proceedings.
 
 C.
 
 37
 We consider finally Buchko's claim that Hospital breached its medical staff by-laws by failing to accord Buchko a pre-disciplinary hearing before notifying FM (through Eltringham) of her perceived misconduct.
 
 
 38
 We agree that the district court properly dismissed this claim by summary judgment as legally unfounded on the undisputed facts of record. Buchko apparently sought to establish in these by-laws a contractual obligation to her on Hospital's part, characterizing her claim as one of breach of "the 'bylaws of staff' and its staff agreement with Plaintiff." J.A. 14. Assuming arguendo a legal proposition by no means clear--that the staff by-laws did give rise to contractually enforceable obligations of Hospital to staff members such as Buchko--we agree with the district court that on the undisputed facts of record there was no breach of any hearing obligation here. The district court carefully examined the "Fair Hearing Plan" section of the by-laws to determine whether any gave rise to an obligation on the facts of this case. The court concluded that, as a matter of law, Eltringham's alleged communications to FM did not fit any of the thirteen categories of medical-staff "recommendations or actions" that trigger hearing obligations.
 
 
 39
 We find no error in that dispositive conclusion and affirm the grant of summary judgment dismissing this claim.
 
 V.
 
 40
 In summary, we affirm the grant of summary judgment dismissing Buchko's breach of contract claim, but vacate and remand for further proceedings consistent with this opinion the tortious interference and defamation claims.
 
 
 41
 SO ORDERED.
 
 
 
 *
 The Honorable J. Dickson Phillips, Jr., Senior Circuit Judge, United States Court of Appeals for the Fourth Circuit, sitting by designation
 
 
 [1]
 Buchko was never actually fired. Instead, FM simply stopped scheduling her as of the expiration of the first year of her annually and automatically renewable contract. So if she was "terminated," to use the language generally used by the litigants here, that termination actually took the form of a de facto failure by FM to renew her contract
 
 
 [2]
 Eltringham concedes that she did report Buchko's "disruptiveness." We agree with the district court that, as a matter of law, that statement would not be defamatory