OPINION
{¶ 1} Plaintiff-appellant, Eugene Jurczak, appeals from a judgment of the Franklin County Court of Common Pleas granting the summary judgment motions of defendants-appellees, JR Schugel Trucking Company ("Schugel"), Debra White, who is employed by Schugel, Kellogg's Company ("Kellogg's"), and Chris Aronhalt, who is employed by Kellogg's.
 {¶ 2} Schugel is a trucking company that carries general commodities. Schugel contracted with Kellogg's to provide trucking services for the delivery of goods, including food, between Kellogg's plant in Zanesville and its facility in Worthington. It is undisputed both companies deemed it important that this "shuttle run" operate timely and continuously 24 hours a day, five days a week.
 {¶ 3} Plaintiff was hired as a truck driver for defendant Schugel in March 1996 and was assigned to drive Kellogg's shuttle run. Plaintiff initially was supervised by Aronhalt, who was then the terminal manager for Schugel. In October 1998, Debra White assumed the position of terminal manager and became plaintiff's supervisor, following Aronhalt's departure from Schugel's employment to work as a logistics manager and supervisor for Kellogg's at its Zanesville plant.
 {¶ 4} The record indicates that, on August 7, 2001, White mailed plaintiff a letter on behalf of Schugel reprimanding plaintiff for not keeping his truck refueled. The letter advised plaintiff that "any future acts of negligence will result in suspension or possible termination of employment."
 {¶ 5} According to plaintiff, he became ill on Sunday, August 26, 2001, and left a message for White that he would not be coming to work on Monday, August 27, 2001, due to the illness. After plaintiff spoke personally to White on Monday morning to confirm he would not be in to work that day due to illness, plaintiff's wife drove him from their home in Newark to Consolidated Personnel Corporation ("CPC") in Columbus, where plaintiff completed an employment application for a truck driver position. The record reflects that in addition to applying for employment at CPC on August 27, plaintiff had also applied for employment with Kellogg's in late spring or early summer 2001, and with Pilot Corporation sometime between August 16-22, 2001.
 {¶ 6} Later on Monday, August 27, plaintiff again telephoned White and told her he would not be in to work on Tuesday, August 28 because he was still too sick to work. After plaintiff did not show up on the shuttle run on Tuesday morning, August 28, 2001, Aronhalt telephoned White to see if there might be a problem. Upon being informed by White that plaintiff had called in sick, Aronhalt told White that on the previous Friday, August 24, at least two of Kellogg's employees heard plaintiff complain about Schugel and tell them he was quitting, or thinking of quitting, his employment with Schugel. The employees were warehouse/dock workers at Kellogg's; Aronhalt supervised them, and they regularly had contact with plaintiff when he picked up and dropped off loads. One of the employees had worked for Kellogg's for 15 years and was second in command in the warehouse.
 {¶ 7} On Tuesday morning, plaintiff also purportedly went to a doctor, who diagnosed plaintiff as having an upper respiratory infection, specifically sinusitis, and gave plaintiff a release to go back to work the following Monday, September 3. According to plaintiff, the doctor prescribed three medications for defendant to take for his condition: an antibiotic, an antihistamine, and Tylenol 3 with codeine, a narcotic. After seeing the doctor, plaintiff telephoned White around noon on Tuesday. He informed her that he had been to a doctor, he was taking narcotic drugs that prohibited him from operating a motor vehicle, and he would be out for the remainder of the week. According to plaintiff, White stated that was "fine," agreed plaintiff should not be driving a truck if he was taking narcotic medication, and requested plaintiff to give her a copy of the doctor's note when he returned to work; White contended she requested that plaintiff send her a copy of the doctor's note immediately. It is undisputed that White then asked plaintiff if a rumor she heard, that he was thinking of quitting, was true. Plaintiff denied the rumor was true and told White that if he were going to quit he would be man enough to tell her to her face, to which White responded, "Oh, okay."
 {¶ 8} At approximately 4:30 p.m. that same day, White received a fax from CPC (1) informing her plaintiff was seeking employment with the company, and (2) requesting verification of his employment with Schugel. According to White, at that point she began to believe that plaintiff was not sick and intended to quit his employment with Schugel, based upon (1) her receipt of the request for verification of employment that was signed on a day plaintiff was purportedly too ill to come to work, (2) the information she received from Aronhalt that plaintiff intended to quit, and (3) plaintiff's failure to provide her with a copy of his medical release.
 {¶ 9} On Wednesday, August 29, purportedly in accordance with company policy to be followed when an employee leaves the company, White instructed the payroll department to mail plaintiff's paycheck to him rather than direct deposit it on Thursday, August 30. Plaintiff and White did not communicate on August 30. White stated she would have redirected the payroll department to direct deposit plaintiff's paycheck on Thursday if she heard from him on that day. White contends plaintiff's failure to call her on Thursday, as she claimed she instructed him to do, confirmed her belief that plaintiff intended to or had in fact quit his job with Schugel.
 {¶ 10} After discovering his paycheck was not direct deposited on August 30, plaintiff telephoned White on Friday, August 31 and left a message inquiring about his pay. Because White was off work on Friday and the following Monday for the Labor Day weekend, she did not receive plaintiff's phone message until Tuesday, September 4. On that Tuesday, White returned plaintiff's call and informed him that Schugel decided to replace plaintiff on the shuttle run with someone more reliable. White made a statement to the effect that if plaintiff was well enough to apply for employment with another company the previous week, he was well enough to come to work. According to White, her statement reflected her belief that plaintiff was not really sick, as he had claimed.
 {¶ 11} Nevertheless, it is undisputed White informed plaintiff he was still employed with Schugel and, although he would not be driving the shuttle run, he could have another position with the company as an over-the-road truck driver. In response, plaintiff flatly refused any other position, and he did not return to work with Schugel. According to plaintiff, his loss of the shuttle run position, together with the failure of Schugel to direct deposit his paycheck, meant his employment with Schugel was terminated, despite the offer of other truck driver positions with Schugel. According to Schugel and White, plaintiff terminated his employment voluntarily.
 {¶ 12} Within a week, plaintiff received job offers from CPC and Pilot Corporation. Plaintiff accepted a truck driver job with Pilot Corporation and commenced employment there on Monday, September 10, 2001, just six days after he last spoke with White.
 {¶ 13} On January 22, 2002, plaintiff filed a complaint alleging: (1) Schugel and White unlawfully discriminated against plaintiff by terminating his employment because he was "disabled" due to his upper respiratory infection, in violation of R.C. 4112.02(A); (2) Schugel and White wrongfully discharged plaintiff in violation of public policy as set forth in R.C. 4511.19; and (3) Aronhalt, and Kellogg's by virtue of respondeat superior, engaged in defamation of plaintiff in stating to White on Tuesday, August 28, that employees of Kellogg's had heard plaintiff express he was thinking of leaving Schugel's employment. On motions by defendants, the trial court granted defendants summary judgment as to all of plaintiff's claims.
 {¶ 14} Plaintiff appeals, assigning the following errors:
I. The trial court erred by granting summary judgment in favor of appellees J R Schugel Trucking Company and Debra White.
II. The trial court erred by granting summary judgment in favor of appellees J R Schugel Trucking Company and Debra White [sic, Chris Aronhalt and Kellogg's Company].
 {¶ 15} Because plaintiff's assignments of error arise out of the trial court's rulings on motions for summary judgment, we view the dispositions independently and without deference to the trial court's determinations. Brown v. Scioto Cty. Bd. of Commrs. (1993),87 Ohio App.3d 704, 711. In conducting our review, this court applies the same standard the trial court employed. Maust v. Bank One Columbus, N.A.
(1992), 83 Ohio App.3d 103, 107, jurisdictional motion overruled (1993),66 Ohio St.3d 1488. Summary judgment should be rendered only where the evidence demonstrates that: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party. Civ.R. 56(C); State exrel. Grady v. State Emp. Relations Bd. (1997), 78 Ohio St.3d 181, 183.
 {¶ 16} Under Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating the absence of a material fact. Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. Once the moving party discharges its initial burden, summary judgment is appropriate if the non-moving party does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that a genuine issue exists for trial. Dresher at 293; Vahila v. Hall (1997),77 Ohio St.3d 421, 430; Civ.R. 56(E).
 {¶ 17} Plaintiff's first assignment of error asserts that the trial court erred in granting defendants Schugel's and White's summary judgment motion as to plaintiff's claims for (1) employment discrimination on the basis of a disability, and (2) wrongful discharge based on public policy.
 {¶ 18} Regarding the employment discrimination claim, plaintiff first contends the trial court erroneously held as a matter of law that plaintiff's upper respiratory illness was not a "disability" within the meaning of R.C. 4112.01(A)(13). Plaintiff's assertion of error is without merit.
 {¶ 19} Discrimination in employment on the basis of a disability is prohibited by R.C. 4112.02, generally referred to as the "handicap discrimination statute," which states in pertinent part:
It shall be unlawful discriminatory practice:
(A) For any employer, because of the * * * disability * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.
 {¶ 20} Not every physical or mental condition from which a person suffers constitutes a disability. See Maloney v. Barberton CitizensHosp. (1996), 109 Ohio App.3d 372. Rather, the handicap discrimination statute was designed to protect those who live with a handicap, or disability, that significantly affects the way they live their lives on a daily basis. Columbus Civ. Serv. Comm. v. McGlone (1998),82 Ohio St.3d 569, 572. R.C. 4112.01(A)(13) defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment."
 {¶ 21} To establish a prima facie case of discrimination under R.C. 4112.02(A) on the basis of a disability, the party seeking relief must establish that (1) he or she was disabled, (2) an adverse employment action was taken by an employer, at least in part, because the individual was disabled, and (3) the person, though disabled, can safely and substantially perform the essential functions of the job in question.McGlone, at 571, citing Hazlett v. Martin Chevrolet, Inc. (1986),25 Ohio St.3d 279, 281; DeBolt v. Eastman Kodak Co. (2001),146 Ohio App.3d 474, 486. Thus, to seek relief under the handicap discrimination statute, a plaintiff must first establish that he or she suffers from a "disability" within R.C. 4112.01(A)(13).
 {¶ 22} Because Ohio's handicap discrimination law is similar to the federal Americans with Disabilities Act ("ADA"), Ohio courts may look to cases and regulations interpreting the ADA for guidance in interpreting Ohio's law. McGlone, at 573; DeBolt, at 486.
 {¶ 23} Similar to Ohio's definition of "disability" in R.C.4112.01(A)(13), the ADA defines a disability as a "physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." Section 12102(2)(A), Title 42, U.S.Code. Several factors should be considered in determining whether an impairment "substantially limits" a major life activity: (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment.Maloney, at 377, citing Section 1630.2(j)(2), Title 29, C.F.R. The interpretive guidelines to the ADA note that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities[,]" such as "broken limbs, sprained joints, concussions, appendicitis, and influenza." Id.; Maloney, at 378. In other words, short-term or temporary restrictions on an employee's physical health or imposed by a physician on an employee are not "substantially limiting," as required to establish a disability under the ADA or Ohio's handicap discrimination statute. See Johnson v. Mason
(S.D.Ohio 2000), 101 F. Supp.2d 566, 575-576; Roush v. Weastec, Inc.
(C.A. 6, 1996), 96 F.3d 840, 843.
 {¶ 24} In the present case, plaintiff neither alleged nor presented evidence that his upper respiratory infection was anything more than a short-term or temporary physical impairment, or that it had any adverse long-term residual effects. In fact, the record reflects plaintiff received a medical release to return to work just over a week after he first became ill, and he started a new job as a truck driver with Pilot Corporation just one week after his medical release to return to work.
 {¶ 25} Because plaintiff had a short-term upper respiratory infection for which he was placed on work restrictions for a period of one week, plaintiff has not demonstrated that he had a physical impairment which "substantially limited" a major life activity, as required to establish a "disability" under R.C. 4112.01(A)(13). Maloney,
supra (holding an employee's temporary back injury for which he was placed on work restrictions for two months, but which had no adverse residual effects, was not a "disability" within R.C. 4112.01[A][13]);Hein v. All America Plywood Co., Inc. (C.A. 6, 2000), 232 F.3d 482, 487
(holding that temporary disabilities are not protected under the ADA). Having failed to establish a "disability," plaintiff cannot succeed on his claim under R.C. 4112.02 for employment discrimination based on his having a disability.
 {¶ 26} Plaintiff further contends that, even if his upper respiratory infection were not a physical impairment that substantially limited a major life activity, he was, nevertheless, "disabled" for purposes of R.C. 4112.02(A) because defendants Schugel and White perceived him as such. See R.C. 4112.01(A)(13) (stating a disability includes being regarded as having a physical impairment). Specifically, plaintiff contends these defendants regarded him as disabled because they allowed him time off work and precluded him from operating tractor-trailer rigs while he was taking a medication containing a narcotic for his upper respiratory infection. Plaintiff's argument is unpersuasive.
 {¶ 27} Initially, the fact that an employer honors an employee's medical restrictions does not necessarily infer that the employer regarded the employee as "disabled." Johnson, at 574; Maloney, at 378. Moreover, it is well-established that a person who seeks the protections of R.C. 4112.02(A) must establish that he or she can safely perform the essential functions of the job. McGlone, at 571; Hazlett, at 281.
 {¶ 28} The United States Supreme Court has observed that "[w]hen Congress enacted the ADA, it recognized the federal safety rules would limit application of the ADA as a matter of law." Albertson's, Inc. v.Kirkingburg (1999), 527 U.S. 555, 573, 119 S.Ct. 2162, 2172. Federal regulations permit employers who are subject to Department of Transportation ("DOT") regulations to require their employees to comply with DOT standards and regulations regarding alcohol and drug use. Section 1630.16(b)(5) and (6), Title 29, C.F.R. § 391.11(b)(4), Title 49, C.F.R. states that only "physically qualified" persons shall drive commercial motor vehicles. Section 383.51(a)(1) — (2), Title 49, C.F.R. provides that a commercial truck driver who is "disqualified" due to drug or alcohol violations must not drive a commercial motor vehicle, and that "[a]n employer must not knowingly allow, require, permit, or authorize a driver who is disqualified to drive" a commercial motor vehicle. Sections 391.41(b)(12)(i)(ii)(B) and 392.4, Title 49, C.F.R. provide that a person is not "physically qualified" to drive a commercial motor vehicle if, among other requirements, the person is under the influence of or uses a narcotic drug or any other substance to a degree which renders the driver incapable of safely operating a motor vehicle, unless it is prescribed by a licensed medical practitioner who has advised the driver that the drug will not adversely affect the driver's ability to safely operate a commercial motor vehicle. Section 521, Title 49, U.S. Code sets forth civil and criminal penalties for violations of DOT motor carrier safety regulations regarding the operation of a commercial motor vehicle by a person under the influence of narcotics or other drugs.
 {¶ 29} In this case, plaintiff specifically alleged, and presented evidence that (1) his physician prescribed narcotic medication for plaintiff and advised plaintiff that it would adversely affect plaintiff's ability to safely drive a commercial motor vehicle, and (2) White expressly agreed plaintiff should not drive a truck for Schugel while taking such medication. (Complaint, Count I, ¶ 3.) Moreover, plaintiff did not demonstrate that Schugel and White would not allow plaintiff to return to work as a truck driver, other than as the shuttle run driver, when his physician released him to return to work. To the contrary, the evidence demonstrates White offered plaintiff continued employment as a truck driver for Schugel upon his release to return to work after his one-week illness, but plaintiff refused the offer. At most, the evidence shows White and Schugel regarded plaintiff as having a short-term physical impairment that temporarily interfered with his ability to drive a truck for Schugel. The evidence does not reflect that defendants treated plaintiff as having a "substantially limiting" physical impairment within the meaning of R.C. 4112.01(A)(13).
 {¶ 30} Accordingly, the trial court correctly granted summary judgment to defendants White and Schugel on plaintiff's claim that they discriminated against him on the basis of a disability in violation of R.C. 4112.02(A), because there were no genuine issues of material fact regarding (1) whether plaintiff had a physical impairment that substantially limited a major life activity, within the meaning of R.C.4112.01(A)(13), and (2) whether defendants treated plaintiff as having a disability within the statute.
 {¶ 31} Plaintiff next asserts the trial court erred in granting summary judgment on plaintiff's claim against defendants White and Schugel for wrongful discharge in violation of public policy as expressed in R.C. 4511.19, which prohibits individuals under the influence of narcotic drugs from operating a motor vehicle. Because R.C. 4511.19
provides for criminal liability upon "individuals" who violate the statute, but does not expressly impose criminal liability upon "employers" who pressure employees into violating the statute, plaintiff contends the public policy expressed in R.C. 4511.19 would be jeopardized if plaintiff cannot bring an action in tort against defendants Schugel and White for discharging plaintiff for not working while he was ill and on medication. Plaintiff bases his claim, that White expected plaintiff to work even though he was ill and taking medication, on White's statement on Tuesday, September 4, that if plaintiff was well enough to apply for a job with another company the week he claimed to be ill, he was well enough to come to work.
 {¶ 32} To succeed on a claim for wrongful discharge in violation of public policy, the plaintiff must first demonstrate that a "`clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity
element).'" Wiles v. Medina Auto Parts, 96 Ohio St.3d 240, 242,2002-Ohio-3994, ¶ 7 (emphasis sic), quoting Painter v. Graley
(1994), 70 Ohio St.3d 377, 384, fn. 8. Second, the plaintiff must show "`[t]hat dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (thejeopardy element).'" (Emphasis sic.) Id. at ¶ 8, quoting Painter,
supra. Both of these elements "are questions of law to be determined by the court." Collins v. Rizkana (1995), 73 Ohio St.3d 65, 70. Third, the plaintiff must demonstrate that "`[t]he plaintiff's dismissal was motivated by conduct related to the public policy (the causation
element).'" Wiles, at ¶ 9 (emphasis sic), quoting Painter, supra. Fourth, the plaintiff must demonstrate that "`[t]he employer lacked overriding legitimate business justification for the dismissal (theoverriding justification element).'" (Emphasis sic.) Id. at ¶ 10. The third and fourth elements are factual issues that are generally for the trier of fact to resolve. Wiles, at ¶ 11; Collins, supra.
 {¶ 33} Arguably, the clarity element is satisfied because R.C.4511.19 sets forth a "clear public policy" of this state prohibiting the operation of a motor vehicle by a person who is under the influence of a narcotic drug. However, the trial court found plaintiff could not satisfy the test to bring a claim for wrongful discharge in violation of public policy because plaintiff could not establish the jeopardy, causation, and overriding justification elements.
 {¶ 34} Regarding the jeopardy element, the Ohio Supreme Court stated in Wiles, at ¶ 15:
An analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful-discharge claim. * * * [T]here is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests. * * * In that situation, the public policy expressed in the statute would not be jeopardized by the absence of a common-law wrongful-discharge action in tort because an aggrieved employee has an alternate means of vindicating his or her statutory rights and thereby discouraging an employer from engaging in the unlawful conduct.
(Citations omitted.)
 {¶ 35} We conclude, as did the trial court, that the absence of a wrongful discharge action in this case would not jeopardize the public policy expressed in R.C. 4511.19. Adequate statutory remedies exist to discourage an employer from allowing or requiring an employee to drive a commercial motor vehicle while taking a narcotic medication, with the companies being subjected to civil and criminal penalties for noncompliance. See Sections 383.51, 391.41, and 392.4, Title 49, C.F.R. and Section 521, Title 49, U.S.Code. Accordingly, the jeopardy element is not satisfied, and the trial court properly granted summary judgment against plaintiff's claim for wrongful discharge in violation of public policy as expressed in R.C. 4511.19.
 {¶ 36} Having concluded summary judgment was properly granted against plaintiff's claims of employment discrimination on the basis of a disability pursuant to R.C. 4112.12(A) and wrongful discharge in violation of public policy as expressed in R.C. 4511.19, we overrule plaintiff's first assignment of error.
 {¶ 37} Plaintiff's second assignment of error asserts the trial court erred in granting summary judgment to defendants Aronhalt and Kellogg's on plaintiff's defamation claim. Specifically, plaintiff contends the trial court erred in holding there were no genuine issues of material fact that (1) the statement at issue was not false or defamatory, and (2) the subject statement was protected by the qualified privilege of "common business interest" and thus was not actionable, even if it was false and defamatory.
 {¶ 38} The alleged defamatory statement consisted of defendant Aronhalt's statement to defendant White to the effect that plaintiff had told other Kellogg's employees that he intended to terminate his employment with Schugel or was thinking about terminating his employment with Schugel. The dispositive question here is whether the statement Aronhalt made to White, concerning plaintiff's alleged intention to quit his employment with Schugel, was qualifiedly privileged.
 {¶ 39} Statements between parties concerning a common business interest may be protected by a qualified privilege. Evely v. Carlon Co.,Div. of Indian Head, Inc. (1983), 4 Ohio St.3d 163, 165. Generally, a communication that is qualifiedly privileged is one "`made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty * * * if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable[.]'" Hahn v. Kotten (1975),43 Ohio St.2d 237, 246. The elements necessary to establish a privilege are "`good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.'" Id. Once a defendant demonstrates the existence of the qualified privilege, the plaintiff can prevail only by presenting clear and convincing evidence that the defendant acted with actual malice. Hanly v. Riverside Methodist Hosp. (1991),78 Ohio App.3d 73, 81, citing Evely, at 166; Jacobs v. Frank (1991),60 Ohio St.3d 111, syllabus; Wilson v. A.E.P. (Apr. 21, 1992), Franklin App. No. 91AP-996. "Actual malice" is defined as "knowledge that the statements are false or with reckless disregard of whether they were false or not." Hahn, paragraph two of the syllabus.
 {¶ 40} Plaintiff argues the "common business interest" privilege is inapplicable because (1) Schugel and Kellogg's are unrelated entities except for their contractual relationship, and (2) White and Aronhalt did not have the same employer when the subject statement was made. Plaintiff's argument is not well-taken.
 {¶ 41} Courts in Ohio have found a "common business interest" privilege exists where two entities share a mutual business interest, even if (1) the entities are not "related" other than having a common business interest, or (2) the person making the statement and the recipient of the statement do not have the same employer. See Smith v. Ameriflora 1992,Inc. (1994), 96 Ohio App.3d 179, appeal not allowed, 71 Ohio St.3d 1427
(holding that statements by officers of construction management firm made regarding a construction coordinator for an exposition were qualifiedly privileged where the statements were made to a sponsor of the exposition for which the firm had been hired); Wilson, supra (holding a letter from a company representative to a contractor for the company regarding the contractor's employee was protected by common business interest privilege); Gaumont v. Emery Air Freight Corp. (1989), 61 Ohio App.3d 277,289 (holding that communications made by Emery employees to employees of Emery's supplier, Mac Tool Company, were covered by the qualified privilege). See, also, Buchko v. City Hosp. Assn. (C.A. 6, 1996),76 F.3d 378 (determining comments by hospital administrator to third-party staffing company about plaintiff, who was employed by third-party staffing company, were privileged based on the common business interest between the hospital and the third-party staffing company).
 {¶ 42} Here, Schugel and Kellogg's had a contractual business relationship pursuant to which Schugel provided a trucking service for Kellogg's between its Zanesville plant and its Worthington facility. Both companies considered it important that the shuttle operate timely. Thus, defendants Aronhalt and White had a common business interest in sharing information, such as plaintiff's possibly quitting Schugel's employment that might impact the continued, smooth operation of the shuttle run.
 {¶ 43} Defendants' evidence demonstrates that Aronhalt's statements to White were made in good faith; plaintiff did not present evidence to dispute that conclusion. The evidence indicates Aronhalt's statements to White were based on information his subordinates provided to him; Aronhalt relayed them to White, only after plaintiff failed to show up on the shuttle run for two days after he allegedly expressed thoughts of quitting. Further, plaintiff did not present evidence disputing defendants' evidence that Aronhalt's statements to White were made in a reasonable manner, to a proper person, for the legitimate business purpose of ensuring the continued smooth operation of the shuttle run, which Aronhalt, on behalf of Kellogg's, had a right to do. Hahn, at 249. Thus, even if we accept plaintiff's contention that the subject statements by Aronhalt to White were false and defamatory, the statements were qualifiedly privileged based on a common business interest between defendants Schugel/White and Kellogg's/Aronhalt.
 {¶ 44} Plaintiff cannot overcome the privilege that protects Aronhalt's statements, because he failed to present evidence showing that Aronhalt's statements to White were made with actual malice, that is, with knowledge that the statements were false or that he acted with reckless disregard as to their truth or falsity. Hahn, at paragraph two of the syllabus; Jacobs, at 116. It is not sufficient for a plaintiff "to show that an interpretation of facts is false; rather, he must prove with convincing clarity that defendant was aware of the high probability of falsity.'" Jacobs, at 119, quoting Dupler v. Mansfield Journal (1980),64 Ohio St.2d 116, 122-123. Plaintiff failed to meet this burden by failing to present evidence that imputes "actual malice" to Aronhalt. Accordingly, the alleged defamatory statements Aronhalt made to White fall within the defense of qualified privilege.
 {¶ 45} Based on the foregoing, we conclude the trial court did not err in granting summary judgment on plaintiff's defamation claim, and plaintiff's second assignment of error is overruled.
 {¶ 46} Having overruled plaintiff's two assignments of error, we affirm the judgment of the trial court dismissing plaintiff's claims against defendants.
Judgment affirmed.
Brown and Sadler, JJ., concur.