[Cite as *Hilty v. Donnellon McCarthy Ents., Inc.*, 2026-Ohio-434.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |  |
|---|---|---|---|
| GRANT HILTY, | : | APPEAL NO. | C-240418 |
|  |  | TRIAL NO. | A-2200405 |
| and | : |  |  |
| MODERN OFFICE METHODS, INC., | : |  |  |
|  |  | *JUDGMENT ENTRY* | |
| Plaintiffs-Appellants, | : |  |  |
| vs. | : |  |  |
| DONNELLON MCCARTHY ENTERPRISES, INC., | : |  |  |
|  | : |  |  |
| Defendant-Appellee. | : |  |  |
|  | : |  |  |

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is reversed and the cause is remanded.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 2/11/2026 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *Hilty v. Donnellon McCarthy Ents., Inc.*, 2026-Ohio-434.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

GRANT HILTY,

   and

MODERN OFFICE METHODS, INC.,

   Plaintiffs-Appellants,

   vs.

DONNELLON MCCARTHY
ENTERPRISES, INC.,

   Defendant-Appellee.

:

:

:

:

:

:

:

:

:

:

:

APPEAL NO.   C-240418
TRIAL NO.    A-2200405

*O P I N I O N*

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: February 11, 2026

*Freking Myers & Reul*, *Jon B. Allison*, *Austin H. LiPuma*, and *Paige E. Richardson*, for Plaintiffs-Appellants,

*Reminger Co., LPA*, *Chad E. Willits*, and *Michael J. Caligaris*, for Defendant-Appellee.

Per Curiam.

{¶1} When plaintiff-appellant Grant Hilty was fired from his job selling copier services and office equipment at defendant-appellee Donnellon McCarthy Enterprises, Inc., ("DME") he found himself in a legal dispute with DME over clients. Thankfully, Hilty and DME worked things out by entering into a settlement agreement: neither party would disparage the other.

{¶2} But soon thereafter Hilty and his new employer, DME competitor plaintiff-appellant Modern Office Methods, Inc., ("MOM") found themselves in the midst of another problem: DME employees were reportedly disparaging Hilty to MOM's potential copy-service clients. So Hilty and MOM sued DME. Hilty brought claims for defamation, breach of the nondisparagement agreement, and tortious interference with his business relationships. MOM sued for tortious interference.

{¶3} The case went to trial, and a Hamilton County jury sided with Hilty, at least on part of Hilty's defamation claim. It found that DME made a false statement about Hilty to a potential client—Angela Conners of Maintenance Methods—and that the statement caused damage to Hilty. But its ultimate verdict was for DME, because the trial court required Hilty to also prove "actual malice"—meaning that DME knew its statement to Conners was false or acted recklessly about the truth. Because Hilty had not proven *that* to the jury, it rejected Hilty's defamation claim.

{¶4} The jury also saw some of the facts differently from what Hilty alleged. For example, the jury determined that two of the statements Hilty sued over were never said, and it found that a third statement by DME was false but caused no harm to Hilty. Nevertheless its verdict on the defamation claim ultimately turned on whether Hilty could establish actual malice. Because he could not, Hilty lost.

{¶5} Hilty also lost his breach-of-contract claim because the trial court

3

determined that it was wholly derivative of his claim for defamation. Hilty's and MOM's claims for tortious interference suffered the same fate.

{¶6} Hilty and MOM now appeal the result below, arguing that the trial court got the legal standards wrong. Importantly they do not challenge the jury's verdict. Instead they contend that the actual-malice standard should not have applied to Hilty's defamation claim and that the trial court erred in instructing the jury to consider this element. They further contend that the breach-of-contract and tortious-interference claims are distinct from the defamation claim and that the trial court should have separately submitted them to the jury.

{¶7} We largely agree. As we explain in this opinion, DME's statement to Conners was not subject to the affirmative defense of qualified privilege and therefore did not trigger the actual-malice requirement. Absent actual malice, the jury found all essential elements of defamation in Hilty's favor, and we remand the cause with instructions that the trial court enter judgment for Hilty on that claim and conduct a trial as to damages.

{¶8} We also agree with Hilty that his breach-of-contract claim was not wholly derivative of his defamation claim, and we remand the matter to the trial court for a trial on that claim too. The trial court, however, did not err in finding Hilty's and MOM's tortious-interference claims to be derivative of Hilty's defamation claim, nor did it abuse its discretion in managing the presentation of evidence at trial. But because the tortious-interference claims are derivative of Hilty's defamation claim, and because Hilty prevailed on that claim, Hilty and MOM are entitled to go forward on their tortious interference causes of action.

{¶9} We accordingly reverse the judgment of the trial court and remand the cause for further proceedings.

## *I. Background*

**{¶10}** On February 1, 2022, Hilty and MOM filed a complaint against DME. It alleged that Hilty had been employed by DME, but was sued after leaving the company. To settle that case, according to the complaint, Hilty and DME entered into an agreement which contained a mutual nondisparagement clause. It provided that neither party would "take any action, or make any statement, whether orally or in writing, which, in any manner disparages or impugns" the other's reputation.

**{¶11}** The complaint contended that Hilty was hired by MOM after leaving DME. It detailed a number of statements allegedly made by DME employees to MOM's prospective clients in violation of the nondisparagement agreement. These statements were also alleged to be defamatory. They included:

- On May 19, 2021, DME's President Jim George called Hilty "a liar" and "a piece of shit" to Tom Quigley at ClaimLinx, a potential customer of MOM ("the Quigley statements").

- On June 15, 2021, DME's Cincinnati sales manager Steve Sexton made defamatory and disparaging comments about Hilty to Wes Keesee of YAC Robot Systems, also a prospective MOM client, and on other occasions told Keesee that Hilty is unethical ("the Keesee statements").

- In July 2021, Sexton told Dr. Alicia Moran and Robin Kilgore at New Hope Community Services, also a prospective MOM client, that Hilty was no longer in the industry, could not help them, wrote bad contracts, stole from DME, and is "shady" ("the Moran statements").

- On July 27, 2021, DME representative Chris Hoffman told Hilairy Begley at prospective MOM client Ennis Britton that Hilty is a liar,

manipulates customers into signing bad deals, and was fired for stealing ("the Begley statements").

- On October 27, 2021, Sexton told Angela Conners at Maintenance Methods, a potential MOM customer, that Hilty was a thief who stole from DME, that DME had to monitor him, and that Hilty had written his contracts incorrectly ("the Conners statements").

{¶12} The complaint alleged that these statements constituted defamation per se and violated the nondisparagement agreement and that Hilty had suffered reputational and financial damage as a result. The complaint also alleged that the statements harmed Hilty's and MOM's business relationships with their potential clients. Hilty raised causes of action for defamation, breach of contract, and tortious interference. MOM advanced a single cause of action—tortious interference.

{¶13} At the close of discovery, the parties filed cross-motions for summary judgment. Hilty's and MOM's summary-judgment motion argued that DME defamed and disparaged Hilty when its employees made the statements identified in the complaint to MOM's prospective customers—who, it turns out, were also current clients of DME. Hilty and MOM claimed that they lost business income and that Hilty's reputation suffered as a result of DME's interference.

{¶14} For its part, DME primarily attacked Hilty's defamation and breach-of-contract claims. As to the breach-of-contract claim, it argued that the DME employees to whom the allegedly defamatory statements were attributed did not have the authority to speak for DME. It further contended that Hilty breached the settlement agreement first by releasing confidential business information to MOM and by making prohibited sales. Lastly, it argued that even if it breached the agreement, the breach was not material.

**{¶15}** As to the defamation claim, DME argued that the alleged defamatory statements made by DME's employees were protected by qualified privilege. As a result, it argued that Hilty was required to demonstrate actual malice to prevail. DME also characterized the statements as unactionable because they conveyed opinions rather than assertions of fact. DME disputed that the statements ever took place. As to the tortious-interference claims, DME cast these as wholly derivative of the defamation claim. Because Hilty's defamation claim was baseless, it argued, that Hilty's and MOM's tortious interference-claims were too.

**{¶16}** The trial court denied the parties' summary-judgment motions on the basis that there were genuine disputes of material fact. It did not identify what the factual disputes were, but simply queried, "[W]ho is telling the truth?"

**{¶17}** Soon thereafter, DME filed a motion for reconsideration requesting the trial court to clarify whether the allegedly defamatory statements were covered by the qualified privilege, which the trial court denied. Instead, it reserved the question of whether Hilty would be required to prove actual malice for trial.

**{¶18}** The parties then filed multiple pretrial motions. Relevant to this appeal, DME filed a motion in limine to bar Hilty from testifying about his conversations with Keesee and Begley on hearsay grounds, which the trial court granted. And Hilty and MOM submitted a pretrial statement seeking to introduce a statement by a former DME employee Steve Harrington that was not identified in the complaint, which the trial court later denied.

**{¶19}** The matter was tried to a jury over five days. Hilty and MOM called several DME clients to testify, including Conners of Maintenance Methods, Quigley of ClaimLinx, and Dr. Moran of New Hope Community Services. Hilty also called Harrington, whom DME hired to replace him. Hilty testified on his own behalf.

7

**{¶20}** The clients testified as to the Quigley, Moran, and Conners statements. They conceded in their testimony that they had a business relationship with DME and contracted with DME for copy services at the time the statements were made. With regard to the statements specifically, Conners testified that she had a phone call with DME manager Steven Sexton in which he defamed Hilty, that she sent Sexton and his manager an email detailing that Sexton called Hilty a "thief" who wrote "incorrect contracts," and that she did not pursue a contract with MOM as a result. Quigley recalled conversations with a DME representative who described Hilty as a liar. Quigley also described a conversation with DME's president Jim George, who described Hilty as a "lying piece of shit." Dr. Moran testified that Sexton told her that Hilty falsified documents, misrepresented facts, and engaged in unethical behavior. She nonetheless decided to contract with MOM. Because Hilty was prohibited from testifying to hearsay statements made to him by clients, no testimony was presented about the Keesee and Begley statements.

**{¶21}** Harrington testified that DME instructed him to inform clients that Hilty was a liar and a cheater, would steal, and was no longer with the company. Harrington admitted that he made this statement to Kanefusa, a DME client. The trial court later instructed the jury to disregard Harrington's testimony.

**{¶22}** Hilty described a 2023 incident that he attributed to a DME employee, Tanner Griffin. A person Hilty believed to be Griffin called MOM to pose as a potential customer inquiring about pricing information. Hilty testified that he memorialized the call in a contemporaneous email to MOM's president Kevin McCarthy. He attempted to show the email to the jury and was initially permitted to do so, but DME objected, arguing that the incident was irrelevant. The trial court ultimately sustained the objection, deeming the email inadmissible and the incident not to be relevant.

{¶23} McCarthy testified that MOM's tortious-interference claim was based exclusively on the defamatory comments made to the clients about Hilty. McCarthy admitted, however, that some of the clients—Dr. Moran at New Hope Community Services, Keesee at YAC Robots, and Begley at Ennis Britton—still contracted with MOM despite DME's alleged defamatory remarks.

{¶24} DME also called a number of witnesses. Critically, Sexton and George denied making the alleged remarks about Hilty to clients.

{¶25} Midway through the trial, the trial court resolved DME's qualified-privilege motion, as well as other lingering legal issues. As to qualified privilege, the trial court determined that the allegedly defamatory statements were subject to the privilege because they were made in furtherance of an employer-employee relationship. It accordingly required Hilty to prove that DME acted with actual malice to prevail on his defamation claim. The trial court also determined that Hilty's breach-of-contract claim and Hilty's and MOM's tortious-interference claims were wholly derivative of Hilty's defamation claim and that these claims too would be subject to qualified privilege and the actual-malice requirement.

{¶26} As to the statements themselves, the trial court concluded that a portion of the Quigley statements—the "piece of shit" comment—was an opinion rather than a statement of fact. It accordingly excluded that statement from the jury's consideration on Hilty's defamation claim. It similarly excised the Keesee and Begley statements, as there had been no proof from Hilty as to those allegations, and Harrington's testimony, as it was not specifically alleged in the complaint. But as to the remaining statements—the Quigley statement that Hilty was a "liar," the Conners statements, and the Moran statements—the trial court found them defamatory per se.

{¶27} At the close of trial, the trial court instructed the jury to determine

whether the Conners, Quigley, and Moran statements in fact occurred. If the statements were in fact made, the jury was next instructed to determine whether each statement was true. If it was not, the jury was asked to decide if the statement proximately injured Hilty. Only if the statement caused injury to Hilty was the jury to consider whether Hilty established actual malice and therefore proved his defamation claim.

{¶28} The jury was not instructed to separately consider the breach-of-contract and tortious-interference claims, as the trial court found that they were wholly derivative of the defamation claim, unless it found DME liable for defamation.

{¶29} On June 18, 2024, the jury found in favor of DME on Hilty's defamation claim. In its interrogatories, it found that the Conners and Moran statements, but not the Quigley statements, occurred and were untrue. But it determined that only the Conners statements proximately caused injury to Hilty. It therefore only considered the question of actual malice as to the Conners statements. Finding there to be no actual malice when the Conners statements were made, the jury determined that Hilty had not established defamation. It therefore never considered the breach-of-contract and tortious-interference claims.

{¶30} This appeal followed.

## II. Analysis

{¶31} Hilty and MOM raise four assignments of error on appeal. They allege that the trial court erred in determining that the defamatory statements made by DME were protected by qualified privilege, in improperly instructing the jury to require actual malice, in finding the breach-of-contract and tortious-interference claims to be wholly derivative of the defamation claim, and in excluding the Keesee, Begley, and Harrington statements, as well as other evidence. DME raises a cross-assignment of

10

error, asserting the trial court erred in failing to grant its motion for summary judgment. We address these arguments in turn.

## A. Qualified Privilege

**{¶32}** In his first assignment of error, Hilty asserts that the trial court's determination that DME's statements made to clients were protected under the qualified-privilege exception was erroneous.[1]  More specifically, Hilty asserts that the trial court improperly determined the privilege on the basis of Hilty's employer-employee relationship with DME and therefore did not fully consider the remaining elements of the qualified-privilege standard.  We agree.

**{¶33}** Qualified privilege is an affirmative defense to a claim of defamation. *Hill v. Ohio Dept. of Rehab. and Corr.*, 2021-Ohio-561, ¶ 17 (10th Dist.).  Where found, it does not absolutely immunize statements from liability, but instead subjects the party claiming defamation to a heightened proof requirement.  *Hahn v. Kotten*, 43 Ohio St.2d 237, 243, 248 (1975).  To overcome the defense of qualified privilege, a party must show that the subject communication was made with actual malice, meaning that the speaker knew it was false or recklessly disregarded the truth. *Jacobs v. Frank*, 60 Ohio St.3d 111, 118 (1991).

**{¶34}** If there is no dispute of fact surrounding the circumstances of the alleged defamatory communication, the determination of whether those circumstances give rise to the privilege is a question of law for the court.  *McLean v. Robertson*, 2016-Ohio-2953, ¶ 16 (1st Dist.).  We review questions of law de novo. *State v. Wilson*, 2010-Ohio-2767, ¶ 4 (1st Dist.).

---

[1] While Hilty and MOM's brief does not specifically indicate which party is challenging the trial court's qualified-privilege finding on appeal, we limit this assignment of error to Hilty, as he was the only party below to pursue a defamation claim.

**{¶35}** No single formula describes precisely when a statement is subject to qualified privilege. *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 8 (1995). Instead, the inquiry focuses on whether the speaker had a duty to speak—public or private, legal or moral—or communicate about a subject matter within the speaker's interest to a person who shares a corresponding interest. *Id.* at 8, citing *Hahn* at 245-246. The defense is deeply rooted in public policy. *A & B-Abell Elevator* at 8. It is designed to rebalance society's interest in protecting damage to reputation against a countervailing interest that demands protection. *Id.*

**{¶36}** Courts have identified five elements to comprise the qualified privilege: (1) the publication was made in good faith, (2) there was an interest to be upheld, (3) the publication was limited in scope to that interest, (4) the publication was made on the proper occasion, and (5) the publication was done in a proper manner and to the proper parties. *Tharp v. Hillcrest Baptist Church*, 2022-Ohio-4695, ¶ 46 (10th Dist.).

**{¶37}** Case law often focuses on the second element—whether there is an interest to be upheld. In this regard, courts have concluded that a common business interest qualifies as such an interest. *Evely v. Carlon Co., Div. of Indian Head, Inc.*, 4 Ohio St.3d 165, 165 (1983). That interest sometimes arises in the context of an employer-employee relationship, when the communication occurs entirely within a single employment setting. *See, e.g., Gaumont v. Emery Air Freight Corp.*, 61 Ohio App.3d 277, 289 (2d Dist. 1989) (holding statements by supervisors and employees involved in theft investigation of coworker to be subject to qualified privilege). In this context, courts have extended the qualified privilege to communications by coworkers to a superior expressing concern about a fellow employee. *See, e.g., Turner v. Wolf*, 1999 Ohio App. LEXIS 5881, *9 (1st Dist. Dec. 10, 1999) ("Where statements are made

concerning the activities of employees arising out of their employment, a qualified privilege is afforded statements concerning matters of common business interest.").

**{¶38}** Despite the trial court's determination otherwise, this is not an employer-employee privilege case. The communications at issue did not occur within a single employment setting, and DME's statements were not directed to their employees. While Hilty had previously been employed by DME, he no longer worked there at the time of the subject communications. And although DME and their clients undoubtedly shared a relationship, that relationship was not as an employer and employee. The trial court therefore erred in determining that qualified privilege applied based on this interest.

**{¶39}** But that does not end the inquiry, as qualified privilege is a question of law, and a common business interest can arise outside of the employment context. We therefore consider whether some other interest between DME and its clients should be protected by qualified privilege. *See Tharp*, 2022-Ohio-4695, at ¶ 46 (10th Dist.) (identifying the existence of an interest to be upheld a required element of qualified privilege).

**{¶40}** Outside of the employer-employee relationship, a common business privilege exists where two entities share a "mutual business interest," even if they are otherwise unrelated or the person making the statement and its recipient do not have the same employer. *Jurczak v. J&R Schugel Trucking Co.*, 2003-Ohio-7039, ¶ 41 (10th Dist.). Cases applying the common-business-interest standard focus on whether the statement in question arises out of or otherwise furthers the parties' mutual business interest. For example, in *Mills Van Lines, Inc. v. Prudential Real Estate and Relocation Servs.*, 2011-Ohio-3833 (8th Dist.), a moving company alleged that a contractor defamed it to a client when the contractor informed the client that the

13

business was overcharging it. *Id.* at ¶ 7-8. The contractor provided relocation services for the client's employees by engaging businesses like the moving company. *Id.* at ¶ 2. Part of the contractor's agreement with the client required it to audit the business's bills and to verify them for accuracy. *Id.* at ¶ 3.

**{¶41}** The court determined that the contractor's report to the client was privileged by the common business interest. *Id.* at ¶ 18. In so doing, the court specifically emphasized that the contractor "was hired by [the client] for the specific purpose to verify these charges." *Id.* at ¶ 18, 21. In other words, because the contractor's and client's shared business interest included the subject matter of the communication, and because the communication was in furtherance of that relationship, the qualified privilege applied. *Id.*

**{¶42}** Similarly, in *Jurczak*, the court applied the common-business-interest standard to statements made by an employee of a food processing company to the supervisor of a truck driver at a food supply company. *Jurczak*, 2003-Ohio-7039, at ¶ 2-3, 42-43 (10th Dist.). The truck driver had been absent from work, and the employee told his supervisor he was planning to quit. *Id.* at ¶ 43. This communication was deemed subject to the qualified privilege under the common-business-interest standard, because the food processor and the food supplier had a common interest in ensuring the timely delivery of supplies. *Id.* at ¶ 44. As the court observed, the companies had a mutual interest in "sharing communication" that might impact their combined business operations. *Id.* at ¶ 42.

**{¶43}** Case after case follows a similar pattern, finding the common-business-interest component of the qualified-privilege test to be satisfied when one participant in a business relationship makes a communication that is in furtherance of both parties' mutually beneficial interests. *See, e.g., Georgalis v. Ohio Turnpike Comm.*,

2010-Ohio-4898, ¶ 28 (8th Dist.) (holding statements by business associates whose companies contracted to complete a telecommunications project to be within a common business interest, where the statements were only made "to parties connected to the [p]roject and for the purpose of addressing concerns with the [p]roject"); *Lail v. Madisonville Child Care Project, Inc.*, 55 Ohio App.3d 37, 40 (1st Dist.) (holding statements by executive director of child care center to organization's board president and a child's mother about a teacher's conduct to be in furtherance of a common business interest).

**{¶44}** From these cases we can discern that there must be some connection between the subject matter of the statement and the parties' mutual business interest for the common-business-interest standard to apply. After all, case law clearly indicates that communication must "*concern*[] a common business interest" to be privileged. (Emphasis added.) *Evely v. Carlon Co., Div. of Indian Head, Inc.*, 4 Ohio St.3d 163, 165 (1983). Statements falling outside the scope of the parties' mutual business interest are therefore excluded from the qualified privilege.

**{¶45}** To prove the point, consider an example. Assume a homeowner and a construction company enter into a contract to build an addition onto the homeowner's house. If the homeowner shares a concern with the construction company about the way a worker is installing brick, that communication is privileged. It relates to and concerns the homeowner's common business interest with the construction company in completing the addition. *Id.* But if the homeowner repeats an allegation she has heard about her cousin, who does not live at the home or work for the construction company, that statement falls outside the homeowner's shared interest with the construction company and is not privileged. *See, e.g., Georgalis*, 2010-Ohio-4898, ¶ 28 (8th Dist.).

15

**{¶46}** The statements made by DME to its clients are profoundly of the latter rather than the former character. DME's sales manager told Dr. Moran that Hilty misrepresented facts, falsified documentation and contract information, and was highly unethical and unprofessional. He also told Conners that Hilty was a thief who had to be monitored and repeated the remark about writing incorrect contracts. Unlike in *Mills*, DME's relationship with Dr. Moran and Conners was to provide copy and office services, not to investigate third-party vendors. But DME's statements were not about copying; rather, they were about the clients' proposed relationships with an outside contractor. DME's statements therefore lacked the quality found present in *Jurczak, Georgalis*, and *Lail*, as they were not in furtherance of the parties' shared business endeavor. Without a doubt, disparaging a business competitor did not directly further or concern DME's mutual interest in effective office services with its clients.

**{¶47}** In arguing otherwise, DME relies heavily on the Ohio Supreme Court's decision in *Hahn*, 43 Ohio St.2d 237. *Hahn* involved statements by an insurance agent's former employer to the insurance company's insureds. *Id*. at 238-239. After the agent was terminated, the insurance company notified its insureds who had worked with the agent that he was no longer employed there. *Id*. If pressed for more information, the company shared that the agent had been fired for cause. *Id*. The agent sued for slander, but the court determined the statements were protected by the qualified privilege. *Id*. at 245. It did so on the basis that the clients were actively doing business with the insurance company at the time of its communications and that there was a common business interest that was furthered by the company's statements. *Id*. In reaching this conclusion, the court emphasized the special relationship between an insurance company and its insureds as a basis for protecting the statements. *Id*. at

247. It therefore applied the qualified privilege to "communications between insurers and insureds." *Id.*

**{¶48}** *Hahn* is distinguishable from this case on a number of fronts. First, and most obviously, *Hahn* is unique to the insurance context. Given the fiduciary relationship that exists between insurance companies and the clients they insure, *Hahn* is of limited utility in the copy-services arena, where no such special duty exists. *Id.* But also of import is the distinction between the communications in *Hahn* and the communications here. In *Hahn*, the insurance company told its insureds that the agent who had serviced their accounts was no longer with the company and, if requested by the client, that he was terminated for cause. *Id.* at 238-239. This information was directly relevant to the business relationship between the insurer and its clients, because it provided valuable information to them about the service of their accounts. But the statements in question here went much further. Far from merely advising clients that Hilty was no longer with DME or that he had been terminated for good reason—statements which could have potentially pertained to DME's contractual relationship with its clients—DME instead made statements implying that Hilty would enter into invalid contracts as an employee of MOM. Rather than addressing DME's services, this communication pertained to potential contracts Hilty wanted the clients to sign with his new employer. Under *Hahn*, this went too far.

**{¶49}** Even if this were a close call, and it is not, we are mindful of the purpose of qualified privilege as we apply it. The privilege exists to protect those who speak out of a moral or legal duty to protect a common or shared interest with the recipient of their communication. *A & B-Abell Elevator*, 73 Ohio St.3d at 8. It is deeply rooted in policy ideals that upend the traditional protection of a person's reputation in favor of protecting those who exercise such a duty. *Id.* From a policy perspective, we cannot

identify a duty or interest that warrants protecting DME's speech in the unique context of this case. To resolve a previous legal dispute, DME agreed not to make disparaging statements about Hilty. If DME felt so compelled, either by a moral obligation or by a shared business interest, to communicate negative information to its clients about Hilty, it should not have contracted away its right to do so.

**{¶50}** We accordingly sustain Hilty's first assignment of error, as the trial court incorrectly applied the qualified privilege to DME's statements.

**{¶51}** Our holding, however, only pertains to the Conners statement. The jury concluded that the Quigley statements did not take place and that the Moran statements did not injury Hilty. Because the jury disposed of these aspects of Hilty's defamation claim without considering actual malice, the trial court's error was harmless as to them. *See Bender v. Durrani*, 2024-Ohio-1258, ¶ 91 (1st Dist.) (defining harmless error in a civil case as that which does not affect a party's substantial rights).

**{¶52}** Absent the actual-malice requirement, the jury determined all of the essential elements of defamation in Hilty's favor on the basis of the Conners statements. We sustain the first assignment of error and accordingly remand the cause to the trial court with instructions to enter judgment in Hilty's favor on Hilty's defamation claim and to conduct a trial as to damages.

### B. Jury Instructions

**{¶53}** In his second assignment of error, Hilty asserts that the trial court incorrectly instructed the jury on the matter of qualified privilege. Our disposition of Hilty's first assignment of error renders this assignment of error moot, and we decline to address it. *See* App.R. 12(A)(1)(c).

### C. Scope of Claims

**{¶54}** In their third assignment of error, Hilty and MOM allege that the trial court erred in concluding that Hilty's breach-of-contract claim and both parties' tortious-interference claims were entirely derivative of Hilty's defamation claim. Hilty also argues that the court erred in excluding the "piece of shit" statement from consideration under the breach-of-contract claim, as well precluding Harrington's statements from being considered as a basis for the defamation and breach-of-contract claims.[2] We address these arguments in turn.

### 1. Derivative Claims

**{¶55}** A claim is derivative when it is "dependent upon the existence of a primary action and can be maintained only so long as the primary action continues." *Morton v. Continental Cas. Ins. Co.*, 2004-Ohio-7126, ¶ 34 (1st Dist.), quoting *Messmore v. Monarch Machine Tool Co.*, 11 Ohio App.3d 67, 68-69 (9th Dist. 1983). As a question of law, we review the question of whether a claim is derivative de novo. *William Powell Co. v. OneBeacon Ins. Co.*, 2020-Ohio-5325, ¶ 47 (1st Dist.).

**{¶56}** Courts have long considered tortious interference to be a derivative claim of defamation. *See A & B-Abell Elevator*, 73 Ohio St.3d at 15; *Georgalis*, 2010-Ohio-4898, ¶ 31 (8th Dist.) (characterizing tortious interference as a derivative claim of defamation). This is because both claims are premised on a theory of tort. *Woods v. Sharkin*, 2022-Ohio-1949, ¶ 61 (8th Dist.), citing *Shifflet v. Thompson Newspapers (Ohio), Inc.*, 69 Ohio St.2d 179, 184 (1982).

**{¶57}** But a breach- of-contract claim is different, in that it protects a different injury. "The purpose of a tort duty of care is to protect society's interest in freedom

---

[2] We again assign this portion of the argument solely to Hilty, as it pertains to causes of action he filed against DME.

from harm, i.e., the duty arises from policy considerations formed without reference to any agreement between the parties. A contractual duty, by comparison, arises from society's interest in the performance of promises." *Ohio Sav. Bank v. H. L. Vokes Co.*, 54 Ohio App.3d 68, 76 (1989), citing *Spring Motors Distribs. v. Ford Motor Co.*, 98 N.J. 555, 579-581 (1985).

**{¶58}** As the Ohio Supreme Court noted in *Corporex Dev. & Constr. Mgmt. v. Shook, Inc.*, 2005-Ohio-5409, tort law is designed to protect against losses sustained by a party's breach of duty imposed by a law to protect general societal interests, whereas contract law allows for parties to govern their own affairs, to bargain freely, and to assume various performance obligations. *Id.* at ¶ 6, 10. Tort claims and contract claims therefore serve distinct purposes and are not derivative of one another.

**{¶59}** Given these guiding principles, we see no problem with the trial court's ruling that Hilty's and MOM's tortious-interference claims were derivative of Hilty's defamation claim.[3] Tortious interference and defamation are traditionally derivative claims, and they were here too. *A & B-Abell Elevator*, 73 Ohio St.3d at 15. After all, McCarthy testified that MOM had no support for its tortious-interference claim other than the alleged defamation.

**{¶60}** But the trial court was wrong to find Hilty's breach-of-contract claim to be derivative of his defamation claim. As a general rule, contract and tort claims serve different objectives and protect different injuries. *Corporex* at ¶ 6, 10. They are typically not redundant of one another. *Id.*

---

[3] Hilty has not asked this court to determine the impact of the trial court's finding regarding the tortious-interference claims in light of his success on the defamation claim. In general, a derivative claim cannot afford greater relief than a primary claim. *See Bradigan v. Strongville City Schools*, 2007-Ohio-2773, ¶ 29 (8th Dist.). We leave it for the trial court on remand to ascertain in the first instance the impact of our determination that Hilty prevailed on his defamation claim on Hilty's and MOM's derivative tortious-interference claims.

**{¶61}** And Hilty's claim itself was not derivative in the context of this case. In pursuing his breach-of-contract claim, Hilty relied squarely on the language of the nondisparagement agreement, which prohibited DME from making any statement, "whether orally or in writing, which in any manner, *disparages or impugns* [Hilty's] reputation." This covers a wider range of communication than defamation does.[4] We accordingly agree with Hilty that his breach-of-contract claim was not wholly derivative of his defamation claim.

**{¶62}** We also agree with Hilty that the trial court erred in excluding the Quigley "piece of shit" statement from the jury's consideration as a basis for breach of contract. It is true that statements of opinion are not actionable as defamation. *Olthaus v. Niesen*, 2023-Ohio-4710, ¶ 1 (1st Dist.). But it is possible that, despite being an opinion, the "piece of shit" comment disparaged or impugned Hilty in violation of the nondisparagement agreement. This was a question for the trier of fact to resolve.

**{¶63}** However, as with Hilty's defamation claim, some of the jury's findings limit the basis for recovery on his breach-of-contract claim. The jury determined that the Quigley statements—minus the "piece of shit" comment—did not occur, barring them from constituting a breach of contract.[5] The jury also concluded that the Moran statements were not injurious. Because damage is an element of breach of contract, the jury conclusively determined Hilty's breach-of-contract claim against him with

---

[4] The terms "disparage[]" and "impugn[]" are not defined in the nondisparagement agreement. We assume the parties meant to use them in their ordinary sense. "Disparage" means "to speak slightingly about (someone or something): to belittle the importance or value of (someone or something)." Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/disparage (last viewed Jan. 30, 2026). "Impugn" means "to assail by words or arguments." Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/impugn (last viewed Jan. 30, 2026). Defamation, in contrast, requires proof of falsity. *Woods*, 2022-Ohio-1949, at ¶ 48 (8th Dist.).

[5] The jury may ultimately have concluded that the "piece of shit" remark was not made either. But because this question was never put to the jury, we do not know how the jury would have resolved it.

respect to these statements. *See Ma v. Cincinnati Children's Hosp. Med. Ctr.*, 2023-Ohio-1727, ¶ 15 (1st Dist.).

**{¶64}** That leaves the Conners statements and the "piece of shit" comment. These statements may or may not have violated the parties' agreement. As the trial court noted, genuine disputes of material fact—including whether DME's employees spoke with agency in making these comments and whether Hilty breached the agreement first—remain for the trier of fact to resolve. We accordingly reverse the trial court's judgment in DME's favor on Hilty's breach-of-contract claim and remand that claim on the Conners statements and the "piece of shit" comment for trial. And because Hilty's and MOM's tortious-interference claims were wholly derivative of Hilty's defamation claim, and he prevailed on that claim, we reverse the trial court's judgment as to those claims and remand them to the trial court as well.

### 2. *Scope of the Defamation and Breach-of-Contract Claims*

**{¶65}** Hilty next contends that the trial court erred in precluding the jury from considering Harrington's testimony as a basis for his defamation and breach-of-contract claims. Harrington testified that DME directed him to inform clients that Hilty was a liar and a cheater and that he would steal. Harrington specifically recalled making these statements to a DME client, Kanefusa. None of these allegations were contained in Hilty's complaint.

**{¶66}** Hilty argues that Ohio's status as a notice-pleading state excuses the absence of the Harrington allegations. It is true that Civ.R. 8 merely requires a short plain statement showing that the complaining party is entitled to relief and a demand for judgment. *Ilboudo v. Cincinnati Metro. Hous. Auth.*, 2025-Ohio-1386, ¶ 8 (1st Dist.). It is also true that certain causes of action—those related to fraud and mistake, but not defamation—must be plead with specificity. *See* Civ.R. 9(B).

**{¶67}** None of this excuses Hilty from identifying the Harrington statements in his complaint as a basis for his defamation claim. A plaintiff suing for defamation cannot merely state the cause of action and do no more. Rather, a complaint for defamation must set forth the allegedly defamatory statements, although they need not be described verbatim. *Bansal v. Mt. Carmel Health Sys.*, 2011-Ohio-3827, ¶ 40 (10th Dist.). In this regard, courts have indicated that a complaint in a defamation case is sufficient when it "identifies the substance of the defamatory remarks." *Martin v. Wegman*, 2019-Ohio-2935, ¶ 8 (1st Dist.).

**{¶68}** Considering a similar issue in *Dudee v. Philpot*, 2019-Ohio-3939, ¶ 46-50 (1st Dist.), we held that the trial court did not err in excluding a statement that had not been plead in the complaint from its consideration of the merits of the plaintiff's defamation claim. This was because the complaint did not put the defendant on notice of the substance of the unalleged statements. *Id.* at ¶ 49.

**{¶69}** Similar to the plaintiff in *Dudee*, Hilty did not identify Harrington's statements as a basis for his defamation claim in his complaint. In the absence of this information, the trial court was correct that they could not be considered as a basis for Hilty's defamation claim. We accordingly overrule this portion of Hilty's argument.

**{¶70}** The law imposes no similar obligation on a plaintiff pleading a breach-of-contract claim. Rather, a plaintiff need only allege in the complaint that a valid contract exists, that the defendant failed to perform, and that damages resulted. *Gilman v. Physna, LLC*, 2021-Ohio-3575, ¶ 17 (1st Dist.). The absence of the Harrington statements from the complaint was therefore immaterial to Hilty's reliance on them as a basis for his breach-of-contract claim.

**{¶71}** Hilty and MOM's third assignment of error is therefore sustained in part and overruled in part. The trial court erred in holding that Hilty's breach-of-contract

23

claim was wholly derivative of his defamation claim. We remand the breach-of-contract claim, narrowed to the Conners and Harrington statements and the "piece of shit" comment, for trial. All other aspects of Hilty and MOM's third assignment of error are overruled.

### D. Evidentiary Conclusions

**{¶72}** In their fourth assignment of error, Hilty and MOM contend that two of the trial court's evidentiary rulings were incorrect. They allege that the trial court abused its discretion in excluding (1) Hilty's testimony concerning the alleged statements made to him by Keesee and Begley, and (2) the email memorializing the Tanner Griffin incident, as well as testimony about the incident itself.

**{¶73}** We review a trial court's evidentiary determinations for an abuse of discretion and may only reverse upon a finding of material prejudice. *Garry v. Borger*, 2023-Ohio-905, ¶ 25 (1st Dist.), citing *Ijakoli v. Alungbe*, 2022-Ohio-2423, ¶ 26 (1st Dist.).

#### 1. *Hearsay*

**{¶74}** Hilty first argues that the trial court should have permitted him to testify as to what Keesee and Begley told him that DME told them.[6] He takes issue with the trial court's finding that this testimony was hearsay.

**{¶75}** We first address whether Hilty preserved this argument below. DME contends that Hilty waived the issue by failing to proffer into the record what he would have said if permitted to testify about the Keesee and Begley statements. *See* Evid.R. 103(A)(2) (requiring an offer of proof to preserve any error in excluding evidence). It is true that Hilty did not place his purported testimony into the record.

---

[6] Because this testimony was introduced to prove Hilty's defamation claim, we interpret this portion of the fourth assignment of error as being advanced solely by Hilty.

**{¶76}** But even if he had, we would not find an abuse of discretion on the trial court's part. Hilty intended to testify as to what DME told Keesee and Begley based on what the clients told him, not based on what he observed for himself. Therefore, Hilty's testimony was not based on personal knowledge, and this justified its exclusion.

**{¶77}** A witness may only testify to matters within their personal knowledge. Evid.R. 602. "'Personal knowledge' is '[k]nowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said.'" *State v. Criswell*, 2024-Ohio-6173, ¶ 20, quoting *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 2002-Ohio-2220, quoting *Black's Law Dictionary* (7th Rev.Ed. 1999). "It follows that '[o]ne who has no knowledge of a fact except what another has told him cannot of course, satisfy the requirement of knowledge from observation.'" *Id.*, quoting *Dublin City School Dist. Bd. of Edn. v. Franklin Bd. of Revision*, 1997-Ohio-327, ¶ 12.

**{¶78}** Regardless of whether Hilty's testimony was inadmissible hearsay, the trial court was correct to exclude it under Evid.R. 602. Given that the personal-knowledge rule justified the trial court's decision, no abuse of discretion occurred. *See Colerain Twp. Bd. of Trustees v. Bench Billboard Co.*, 2020-Ohio-4684, ¶ 14 (1st Dist.) (holding that an appellate court shall affirm a court's judgment that achieves the right result for the wrong reason).

### 2. *Relevance*

**{¶79}** Hilty and MOM next argue that the trial court erred in excluding Hilty's email to McCarthy memorializing his impressions of the Tanner Griffin incident, as well as Hilty's testimony about what occurred. This ruling was premised on the trial court's determination that the incident was irrelevant to Hilty's and MOM's claims.

**{¶80}** Evid.R. 402 provides that all relevant evidence, or evidence that has a

tendency to make a fact of consequence more or less probable, may be admissible. A trial court has broad discretion to determine when evidence meets this standard. *State v. McCoy*, 2005-Ohio-4262, ¶ 8 (9th Dist.).

**{¶81}** Hilty and MOM claimed that DME tortiously interfered with their business relationships with potential clients. To us, the Tanner Griffin incident seems potentially relevant to those claims. Hilty testified that a person he recognized as Griffin, a DME employee, called MOM, posing surreptitiously as a client, for the purpose of obtaining price information. If believed, this evidence could potentially substantiate Hilty's and MOM's claims that DME acted to undercut their client relationships through a competitive-pricing scheme.

**{¶82}** But we can only reverse a trial court's evidentiary ruling for an abuse of discretion, which requires more than an error in judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Rather, to reverse, we must find the trial court acted unreasonably, unconscionably, or arbitrarily. *Id.* That the trial court did not do. *See Johnson v. Abdullah,* 2021-Ohio-3304, ¶ 39 ("courts lack the discretion to make errors of law, particularly when the trial court's decision goes against the plain language of a statute or rule").

**{¶83}** Importantly, Hilty could not definitively identify the caller as Griffin. And the trial court may have reasoned that this ambiguity would merely muddy the waters about DME's conduct. We cannot find an abuse of discretion in the trial court's judgment call. We accordingly overrule this portion of Hilty's fourth assignment of error.

**{¶84}** Because neither of Hilty's evidentiary challenges are well-taken, his fourth assignment of error is overruled.

### E. DME's Cross-Assignment of Error

{¶85} In a cross-assignment of error, DME argues that the trial court should have granted its motion for summary judgment. This argument is not cognizable, as DME did not file a cross-appeal. *See* App.R. 3(C)(1); *State v. Wilcox*, 2021-Ohio-2282, ¶ 7-8 (1st Dist.) ("Where an appellee seeks to change the order, a notice of cross-appeal must be filed."). We accordingly dismiss DME's cross-assignment of error.

### III. Conclusion

{¶86} The jury has spoken on part of Hilty's case against DME. DME's sales manager made false statements about Hilty to Conners, and those statements injured Hilty. Because the trial court was wrong to require Hilty to prove that DME made the statements with actual malice, Hilty is entitled to judgment in his favor on his defamation claim and a trial to establish the amount of damages he is owed. We accordingly sustain Hilty's first assignment of error, which renders his second assignment of error moot.

{¶87} The trial court also erred in determining that Hilty's breach-of-contract claim was wholly derivative of his defamation claim. We remand that claim—as to the Conners and Harrington statements and "piece of shit" comment—for trial. However, the trial court did not err in holding Hilty's and MOM's tortious-interference claims to be derivative of Hilty's defamation claim, nor did it err in precluding Hilty from relying on Harrington's statements as a basis for his defamation claim. But because Hilty prevailed on his defamation claim, the trial court should not have dismissed Hilty's and MOM's tortious-interference claims on the ground they were wholly derivative of the defamation claim. We accordingly sustain Hilty and MOM's third assignment of error in part and overrule it in part.

{¶88} We also overrule Hilty's fourth assignment of error. The trial court did

not abuse its discretion in excluding portions of Hilty's testimony.

{¶89} The judgment of the trial court is therefore reversed. We remand the cause for further proceedings consistent with this opinion.

Judgment reversed and cause remanded.

**KINSLEY, P.J., MOORE** and **BOCK, JJ.**